UNITED STATES of America, Appellee,

v.

Karl R. HUBER, Defendant-Appellant.

No. 1202, Docket 79–1132.

United States Court of Appeals, Second Circuit.

Argued June 21, 1979.

Decided July 20, 1979.

Jeffrey D. Ullman, New York City (Bohrer, Ullman & Taikeff, New York City, Barry A. Bohrer, New York City, of counsel), for defendant-appellant.

George E. Wilson, Asst. U. S. Atty., New York City (Robert B. Fiske, Jr., U. S. Atty., S. D. New York, Howard W. Goldstein, Asst. U. S. Atty., New York City, of counsel), for appellee.

Before WATERMAN, FEINBERG and TIMBERS, Circuit Judges.

FEINBERG, Circuit Judge:

Karl R. Huber appeals from a judgment of conviction following a lengthy jury trial on a multi-count indictment before Judge Charles H. Tenney in the United States District Court for the Southern District of New York. Appellant was charged in Count One with conspiring, among other things, to defraud the United States in connection with its administration of the Medicaid, Medicare and Hill-Burton programs, to make and cause to be made false statements to a government agency in a matter within its jurisdiction, and to use the mails in furtherance of a scheme to defraud in violation of 18 U.S.C. § 371. Counts Two through 24 charged appellant with making, and causing to be made, false, fictitious and fraudulent statements to the United States Department of Health, Education and Welfare in violation of 18 U.S.C. §§ 1001, 2. Counts 25–33 charged using the mails in furtherance of a scheme to defraud certain insurance companies, hospitals, the United States, and the States of New York and New Jersey in violation of 18 U.S.C. §§ 1341, 2. In addition, appellant was charged with six counts of transporting stolen money in interstate commerce, in violation of 18 U.S.C. §§ 2314, 2 (Counts 34–39), one count of making false material declarations before a grand jury in violation of 18 U.S.C. § 1623 (Count 40), and one count of conducting the affairs of an enterprise through a pattern of racketeering activity in violation of 18 U.S.C. §§ 1961, 1962(c), 1963, 2 (Count 42).[1]

During the course of the trial, the district court entered judgments of acquittal on Counts 14–16, 20, 27, and 34–39. The jury convicted appellant on all of the remaining counts, and returned a special verdict in which it found that the enterprise concerned in Count 42 consisted of the following entities also found to be wholly owned by appellant: Tudor, Inc. (Tudor), Boden, Inc. (Boden), Atlantic Medical Corporation (Atlantic), Hospital Equipment Company (HEC), Debs Hospital Supplies, Inc. (Debs), Medical Facilities, and Hospital Furniture/Medical Facilities (HF/MF). Judge Tenney sentenced appellant to a three-year prison term on the conspiracy and false statement counts and a two-year term on the mail fraud counts to run concurrently with each other, and to a one-year term on the perjury count to be consecutive to the other prison terms, a total of four consecu-

---

1. Also charged, in Counts One to 39 and 42 were Huber's father Karl Huber, Peter M. Conroy and Anthony W. Eckert, Jr. Appellant's father was also charged in Count 41 with making false material declarations before a grand jury, in violation of 18 U.S.C. § 1623. His trial was severed because of ill health. Conroy and Eckert pleaded guilty prior to trial to the conspiracy count, four false statement counts, and four mail fraud counts, and each was sentenced to six months' imprisonment, three years' probation, and a $25,000 fine.

tive years.  Appellant was fined $5,000 on the conspiracy count and on each of the false statement counts, and $1,000 on each of the mail fraud counts, a total of $108,000. The judge directed conditional forfeiture of appellant's enterprise in accordance with the special verdict on the racketeering count.  The condition gave appellant the option to redeem his corporations by payment within six months of cash or other property satisfactory to the Attorney General having a value of $100,000.  Appellant was also required to bear the costs of prosecution, which amounted to $19,412.72.  He remains free on $50,000 bail pending appeal.

Appellant makes numerous arguments to us, variously seeking either a new trial or the striking of some of the counts and a resentencing.  For the reasons set forth below, we affirm the judgment of conviction in all respects.

# I

A number of appellant's arguments concern the legal sufficiency of the evidence. At this juncture, we briefly summarize the activities for which appellant was convicted viewing the evidence most favorably to the government.  Detailed review of the evidence will be added later where necessary.

Appellant Karl R. Huber, an honors graduate of Princeton University, a 1965 graduate of Harvard Law School and a member of the New Jersey bar, joined his father, Karl Huber, in the latter's allegedly troubled business ventures instead of working for a law firm in Newark as planned.  In October 1971, appellant and his father obtained control of HEC, an established New Jersey hospital supply house.  HEC, through its contract division, Medical Facilities, and a series of corporate successors, entered into a number of cost-plus contracts with hospitals in New York and New Jersey for the sale of hospital and surgical supplies, furniture and equipment.  The price

consisted of the manufacturers' invoiced costs to HEC plus a specified mark-up (usually between five and eight percent) and the net cost of any freight.  The evidence showed that the Hubers knew about and understood the nature of the cost-plus contracts from the time they took over HEC, were involved in and managed the hospital supply business on a day-to-day basis, and were kept apprised in detail about new contracts as they were made.

Shortly after the Hubers acquired HEC, and at their specific direction, HEC employees Conroy and Eckert, see note 1 supra, began to inflate the manufacturers' costs quoted to the hospitals.  At appellant's suggestion, invoices were falsified where necessary.  The hospitals were also charged for freight not actually incurred.  The term "phantom freight," apparently coined by appellant's father, was in general usage at the office.  As a result of these fraudulent practices, HEC and Medical Facilities received an effective mark-up of roughly between 18 percent and 29 percent rather than the five to eight percent specified in the contracts.  There was evidence that the mails were used in connection with the scheme to defraud the hospitals.  The fraudulent overcharges totalled nearly $471,000, most of which was subject to reimbursement by either the federal or state government.[2]  Further, each hospital capitalized the costs incurred in outfitting it, and a depreciation expense was annually claimed as part of each hospital's operating expenses.  These expenses were reported to insurance companies, which served as fiscal intermediaries for the Medicare and Medicaid Programs.  The cost reports formed the basis for reimbursement by the federal and state governments, and the fraud resulted in inflated depreciation claims of nearly $105,000.  The nature of the federal and state hospital funding programs was made clear to the Hubers from the outset of their involvement in the hospital supply opera-

2.  The federal government would reimburse the hospitals through the United States Public Health Service under the Hill-Burton Act, 42 U.S.C. § 291 et seq.  State reimbursement would be by the New York Department of Health under N.Y.Pub. Health Law, Arts. 28-A and 28-B (McKinney 1977), the Nursing Home Companies Law and the Hospital Mortgage Loan Construction Law, respectively.

tion, and they understood that those programs would stimulate hospital expansion.

In July 1977, appellant appeared before a grand jury that was investigating whether fraud had been committed by HEC or its successors. Appellant denied to the grand jury that he exercised close control over the hospital business and that he knew of the cost-plus nature of the contracts or the meaning of the term "phantom freight." The proof at trial overwhelmingly showed otherwise.

In defense, appellant contended that he and his father had been cheated by Conroy and Eckert and that if appellant was directly involved in the fraudulent scheme, because of the peculiar relationship between him and his domineering father, appellant lacked the independence of will necessary to form the intent needed to sustain the convictions. Numerous witnesses, expert and otherwise, testified on this latter point. Appellant also testified in his own defense.

## II

Appellant makes several challenges to his conviction on Count 42 of the indictment, which charged that he conducted the affairs of an enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), and which resulted in the forfeiture of the enterprise pursuant to 18 U.S.C. § 1963. Those provisions are part of Title IX of the Organized Crime Control Act of 1970 (Act), Pub.L. No. 91–452, 84 Stat. 922, reprinted in [1970] U.S.Code Cong. & Admin.News p. 1073, which was enacted in response to what Congress perceived as the threat to the American economy from the unchecked growth of organized crime. *United States v. Parness*, 503 F.2d 430, 439 (2d Cir. 1974), cert. denied, 419 U.S. 1105, 95 S.Ct. 775, 42 L.Ed.2d 801 (1975). The Act was intended in part to remedy

> defects in the evidence-gathering process of the law inhibiting the development of the legally admissible evidence necessary to bring criminal and other sanctions or remedies to bear on the unlawful activities of those engaged in organized crime and because the sanctions and remedies available to the Government are unnecessarily limited in scope and impact.[3]

Title IX of the Act added a new Chapter 96 to Title 18 of the United States Code, entitled "Racketeer Influenced and Corrupt Organizations" (RICO). The purpose of RICO is to enable law enforcement authorities not only to punish individual criminals, but to separate the corrupt interstate enterprises in which they were involved from their criminal organizations so that prosecutions will do more than merely impose a "compulsory retirement and promotion system as new people step forward to take the place of those convicted." S.Rep. 91–617, 91st Cong., 1st Sess. 78 (1969) (Senate Report). Thus, in order to "deal not only with individuals, but also with the economic base through which those individuals constitute such a serious threat to the economic well-being of the Nation," id. at 79, RICO, in 18 U.S.C. § 1963, imposes the sanction of forfeiture of an "enterprise" involved in violations of 18 U.S.C. § 1962.

That section specifies the kinds of corrupt infiltration into interstate commerce that Congress sought to prevent. The section provides:

> (a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity of through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce
>
> .     .     .     .     .

---

3. The quotation is from the Act's statement of findings and purpose, reprinted in [1970] U.S. Code Cong. & Admin.News at 1073.

(b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section.

A "pattern of racketeering activity" is defined in 18 U.S.C. § 1961(5) as consisting of at least two acts of racketeering activity within ten years of one another. "Racketeering activity" is defined in 18 U.S.C. § 1961(1) as any of a wide variety of serious criminal acts under state and federal law, including mail fraud in violation of 18 U.S.C. § 1341, which was the racketeering activity charged in the indictment here.[4] Since appellant was charged with a violation of section 1962(c), the government had to show that appellant had committed at least two acts of mail fraud within ten years of one another in the conduct of the affairs of an enterprise in interstate commerce with which he was associated.

Pointing to what he claims are inconsistent judicial interpretations of RICO, appellant urges this court to reconsider its holding that RICO is not unconstitutionally vague. See *United States v. Parness,* supra, 503 F.2d at 440–42. We decline the invitation, noting that each circuit court faced with the issue has reached the same result. See *United States v. Hawes,* 529 F.2d 472, 479 (5th Cir. 1976); *United States*

*v. Campanale,* 518 F.2d 352, 364 (9th Cir. 1975), cert. denied, 423 U.S. 1050, 96 S.Ct. 777, 46 L.Ed.2d 638 (1976); *United States v. Cappetto,* 502 F.2d 1351, 1357–58 (7th Cir. 1974), cert. denied, 420 U.S. 925, 95 S.Ct. 1121, 43 L.Ed.2d 395 (1975). See also Atkinson, Criminal Law, "Racketeer Influenced and Corrupt Organizations," 18 U.S.C. §§ 1961–68: Broadest of the Federal Criminal Statutes, 69 J.Crim.Law 1, 4 n. 26 (1978).

In a number of loosely related arguments concerning the composition to the enterprise to be forfeited, appellant claims that a group of corporations cannot be an "enterprise" within the meaning of RICO, that the government's theory of the composition of the enterprise varied in the indictment and at trial, that the indictment was duplicitous in the RICO count, that the judge's charge concerning the degree of connection that the government had to show between each corporation and appellant's racketeering activity was erroneous, that the evidence was insufficient to support the inclusion of certain of the corporations in the enterprise, and that the use of a special verdict to determine the composition of the enterprise was error, prejudiced the defense, and in any event did not cure any of the other problems just itemized.

Appellant's argument that a group of corporations cannot be an enterprise within the meaning of the statute stems from an overly rigid reading of the definitions contained in section 1961. Subsection (4) provides

"enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.

The argument runs that since the term "corporation" is in the singular, the only way a group of corporations may be an "enterprise" within the meaning of the statute is if they come within the language, "group of individuals associated in fact."

---

**4.** The indictment also charged transportation of stolen money in interstate commerce, in violation of 18 U.S.C. § 2314, as part of the racketeering activity. The substantive charges of 18 U.S.C. § 2314 violations, Counts 34–39, were not submitted to the jury.

And since "person" is defined in subsection (3) as including "any individual or entity . . . ," it must be that the term, "individual," since used in the disjunctive with "entity," cannot encompass an entity such as a corporation. Therefore a group of corporations cannot be a "group of individuals associated in fact" within the meaning of the definition of "enterprise." But this makes nonsense of the statute. First, the language does not require that result. The definition of "enterprise" is a list beginning with the word "includes." This indicates that the list is not exhaustive but merely illustrative. See, e. g., *Federal Land Bank of St. Paul v. Bismarck Lumber Co.,* 314 U.S. 95, 99–100, 62 S.Ct. 1, 86 L.Ed. 65 (1941). Second, at least, where the enterprise is commercial, courts have consistently construed "enterprise" broadly in light of Congress' mandate that the provisions of Title IX of the Act "shall be liberally construed to effectuate its remedial purposes," Act § 904(a), [1970] U.S.Code Cong. & Admin.News at p. 1104. See, e. g., *United States v. Altese,* 542 F.2d 104, 106 (2d Cir. 1976), cert. denied, 429 U.S. 1039, 97 S.Ct. 736, 50 L.Ed.2d 750 (1977); *United States v. Parness,* supra, 503 F.2d at 439. Congress was concerned about the impact on the American economy of the infiltration of organized crime into interstate commerce. There is no reason to believe that Congress cared what form such infiltration took, except to indicate by an abundance of caution in listing the examples in the definition of enterprise that all such harmful infiltration, regardless of form, should be eradicated. To view "enterprise" as excluding groups of corporations would make it too easy to avoid RICO's forfeiture sanction. One could simply transfer assets from the corporation whose affairs had been conducted through a pattern of racketeering activity to another corporation whose affairs had up to that point not been so conducted. We agree with the government that appellant's reading of the statute would perversely insulate the most sophisticated racketeering combinations from RICO's sanctions, the precise opposite of Congress' intentions.

■ Appellant claims that the government's theory of the case never crystallized, that it never decided whether the prosecution was based on a single enterprise composed of one or more of the seven entities listed in the indictment, or a seven-enterprise theory. We disagree. Although there were occasions when the word "enterprises" was used in the indictment and during the trial, it seems clear that it was used as a synonym for "entities" rather than in the technical sense of a RICO enterprise. While the government might be faulted for imprecise language on occasion, it is clear that the indictment was predicated on a one-enterprise theory, and that that was the basis on which proof was offered and on which the jury was charged.

■ Appellant also claims that the indictment was duplicitous in that Count 42, the RICO count, charged a series of acts through a number of entities, and that the jury was therefore not required to agree unanimously on any particular fact to reach a guilty verdict. Appellant's failure to raise this claim prior to trial "may be deemed" a waiver. Fed.R.Crim.P. 12(b)(2); *United States v. Kelley,* 395 F.2d 727, 729 (2d Cir.), cert. denied, 393 U.S. 963, 89 S.Ct. 391, 21 L.Ed.2d 376 (1968). Further, the convictions on all the mail fraud counts submitted to the jury coupled with the special verdict specifying that all the entities were members of the enterprise show that the jury was obviously not divided on the theory underlying its verdict of guilt.

■ Appellant argues that Judge Tenney's charge permitted the jury to find that the various entities were part of the enterprise if it found that defendant owned them all even if he conducted the affairs of only one of them through a pattern of racketeering activity. The government properly concedes that such a connection alone would not support application of RICO's forfeiture sanction to enterprises whose affairs were not conducted through a pattern of racketeering activity. However, so long as the jury is correctly apprised of the elements of a RICO violation and is instructed that it may find an entity owned by a defendant to

be part of the enterprise only if the evidence warrants, then there is no error. We do not believe Judge Tenney's charge authorized the jury to include entities in the enterprise merely because they were owned by appellant. Reading the charge as a whole, we think the jury understood that it could not include a particular entity in the enterprise unless its affairs were found to have been conducted through the pattern of racketeering activity.

■ Appellant contends that, even if the jury was properly instructed, the evidence was insufficient to link a number of the enterprises to the pattern of racketeering activity. The evidence at trial, however, viewed most favorably to the government, established that Tudor, Boden, Atlantic, HEC, Debs, Medical Facilities and HF/MF were involved in the racketeering activity as follows. First, appellant virtually concedes that the evidence was sufficient to show that the affairs of Medical Facilities and HF/MF were conducted through a pattern of racketeering activity. The focus of the argument is really on the five other entities. Medical Facilities was the contract division of HEC when the Hubers acquired HEC in October 1971 through Tudor, a Huber controlled corporation. In 1972, HEC became the wholly owned subsidiary of Atlantic, another corporation controlled by the Hubers. During the operation of the fraud, checks totalling $871,000 were drawn on HEC by the Hubers in favor of Independent Management Company (IMC), a division of Tudor. This was during a period when Huber made large transfers of funds among various company checking accounts. The jury could infer that checks drawn on HEC to IMC represented funds derived from the scheme to defraud the hospitals on the cost-plus contracts serviced by Medical Facilities. In 1973, Tudor acquired Debs. Huber then had Tudor trade its Debs stock for Atlantic's HEC stock. In 1973, HEC was wound down, and its business was transferred to Debs. Debs's name was pasted over HEC's name on the invoices. HF/MF was then formed and became the successor to the hospital design and interior business of

HEC and Debs. The latter ceased operations in March 1974, and HF/MF ceased in May 1975. Shortly before this last event, Huber shifted to Boden all of Tudor's assets, subject to its liabilities. Thus, these companies were not merely unrelated businesses owned by the same person. They were all involved in the hospital supply operation, which could be fairly characterized as a single business operated under various names and forms chosen by appellant to suit his own purposes and convenience.

Appellant relies heavily on *United States v. Nerone,* 563 F.2d 836 (7th Cir. 1977), cert. denied, 435 U.S. 951, 98 S.Ct. 1577, 55 L.Ed.2d 801 (1978), in arguing that not all of the seven entities were conducted "through a pattern of racketeering activity." There, the Seventh Circuit reversed a RICO conviction where the defendants had been charged with conducting the affairs of Mapel Manor, Inc., a trailer park corporation, through a pattern of racketeering activity. The defendants apparently conducted an illegal gambling operation in one of the mobile homes at their trailer park. But the gambling operation had nothing to do with the affairs of the trailer park. There was no "endeavor to show that gambling revenues were used by or in any way channeled into the corporation or that persons were paid out of gambling revenues to perform services for Mapel Manor, Inc." Id. at 851. Thus, the government's RICO case failed there "because of a total want of proof of the connection between the racketeering activities and the affairs of Mapel Manor, Inc." Id. at 852. Moreover, the trailer park was not in the gambling business. In contrast to that case, the seven entities here were all in the hospital supply business, and that business was conducted through a series of mail frauds.

■ We thus find there was sufficient evidence to sustain the charge that the affairs of the seven entities were conducted by appellant through a pattern of racketeering activity. We note, however, that the potentially broad reach of RICO poses a danger of abuse where a prosecutor at-

tempts to apply the statute to situations for which it was not primarily intended. Therefore, we caution against undue prosecutorial zeal in invoking RICO. We also emphasize to the district judges that when RICO is invoked each set of facts must be evaluated independently. We cannot at this point lay down any fixed rules concerning the applicability of the statute. For example, in some cases a pattern of racketeering activity in the conduct of a subsidiary's affairs may not be attributable to the parent. We hold only that on these facts, particularly the evidence of continuous manipulation of the form of the business and the transfer of large sums among the corporations, these entities were sufficiently intertwined in the mail fraud to be deemed part of the RICO enterprise.

█ Appellant also challenges the use of the special verdict. Fed.R.Crim.P. 31(e) provides:

Criminal Forfeiture. If the indictment or the information alleges that an interest or property is subject to criminal forfeiture, a special verdict shall be returned as to the extent of the interest or property subject to forfeiture, if any.

This provision, along with Fed.R.Crim.P. 7(c)(2) governing indictments, was specifically added to the rules in 1972 "to provide procedural implementation of the recently enacted criminal forfeiture provision of [RICO]." Notes of Advisory Committee on Rules, Rule 7(c)(2). Appellant claims that the Rule authorizes the use of a special verdict only to the extent necessary to determine a defendant's interest in an enterprise, but not for the purpose of identifying membership in the enterprise. Here the special verdict called for both inquiries. The jury was required to specify which corporations were part of the enterprise and the percentage of appellant's interest in each. Appellant argues that since the former was unauthorized by Rule 31(e), the special verdict runs afoul of the asserted general proposition that special verdicts are anathema to federal criminal procedure. However, we believe this special verdict to

be wholly within the confines of Rule 31(e). Given the nature of the enterprise alleged, it was obviously necessary for the jury to say which entities were part of it, as well as appellant's interest in each, in order to determine the "extent of the . . . property subject to forfeiture."

Finally, appellant argues that the forfeiture sanction violates the Eighth Amendment's proscription on cruel and unusual punishments.[5] Judge Tenney rejected the contention in a lengthy oral opinion. RICO is apparently the first modern federal statute to impose forfeiture as a criminal sanction directly on an individual defendant. As noted in the Senate Report to RICO,

While there is some indication that this concept of criminal forfeiture was in usage in the colonies, the First Congress by Act of April 20, 1790, abolished forfeiture of estate and corruption of blood, including in cases of treason. That statute, as revised, is found in 18 U.S.C. § 3563 . . . . From that date to the present, therefore, no Federal statute has provided for a penalty of forfeiture as a punishment for violation of a criminal statute of the United States. Section 1963(a), therefore, would repeal 18 U.S.C. § 3563 by implication.

Senate Report at 80. However, what is innovative about RICO is not that it imposes forfeiture as a consequence of criminal activity, but rather that it imposes it directly on an individual as part of a criminal prosecution rather than in a separate proceeding in rem against the property subject to forfeiture. Statutes providing for in rem forfeiture of property related to criminal activity are relatively common. See, e. g., 49 U.S.C. §§ 781–83 (relating to narcotics violations); Legislative Note, Organized Crime Control Act of 1970, 4 U.Mich.J. of Law Reform 546, 624 & n. 13 (1971). Such statutes have been upheld even where, unlike here, the effect is to deprive an owner of property where that owner is not the person guilty of using the property for criminal purposes. See *Goldsmith-Grant*

---

5. Both parties incorporated by reference their arguments on this issue in the district court.

*Co. v. United States,* 254 U.S. 505, 511, 41 S.Ct. 189, 191, 65 L.Ed. 376 (1921) (statute "too firmly fixed in the punitive and remedial jurisprudence of the country to be now displaced"). Further, such "a forfeiture proceeding is quasi-criminal in character. Its object, like a criminal proceeding, is to penalize for the commission of an offense against the law." *Plymouth Sedan v. Pennsylvania,* 380 U.S. 693, 700, 85 S.Ct. 1246, 1250, 14 L.Ed.2d 170 (1965). At least for this purpose, there is no substantial difference between an in rem proceeding and a forfeiture proceeding brought directly against the owner. Cf. *Shaffer v. Heitner,* 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977).

■ We do not say that no forfeiture sanction may ever be so harsh as to violate the Eighth Amendment. But at least where the provision for forfeiture is keyed to the magnitude of a defendant's criminal enterprise, as it is in RICO, the punishment is at least in some rough way proportional to the crime. We further note that where the forfeiture threatens disproportionately to reach untainted property of a defendant, for example, if the criminal and legitimate aspects of the "enterprise" have been commingled over time, section 1963 permits the district court a certain amount of discretion in avoiding draconian (and perhaps potentially unconstitutional) applications of the forfeiture provision. Section 1963(c) provides:

> Upon conviction of a person under this section, the court shall authorize the Attorney General to seize all property or other interest declared forfeited under this section upon such terms and conditions as the court shall deem proper.

In this case, Judge Tenney provided in his sentence that the seizure

> shall be on the following terms and conditions: (1) that defendant may redeem and repossess himself of said entities at any time within six months of the date of this judgment upon payment or delivery to the Attorney General of cash or other property satisfactory to the Attorney General having a value of $100,000 . . . .

We certainly cannot say that the forfeiture provision is unconstitutional as applied to these circumstances, even if there were some doubt about its application to others.

Having determined that appellant's conviction under the RICO count is entirely proper, we turn to the other points raised.

### III

Huber raises several points with respect to his false statement convictions under 18 U.S.C. §§ 1001, 2. Section 1001 provides:

> Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more five years, or both.

Section 2 provides:

> (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
>
> (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

Huber was convicted on 19 counts for having caused six hospitals with which he dealt to submit claims to the government, through fiscal intermediaries, for reimbursement for depreciation costs that were inflated due to fraud. The 19 convictions represented each hospital's annual claims over three, and in one case four, years.

■ Appellant first argues that the statements made to the government were not literally false, since the figures reported as the basis on which depreciation was calculated reflected the hospitals' actual origi-

nal (albeit inflated) costs. But the hospitals were required to certify that the claims submitted represented properly reimbursable costs. Appellant bases his argument on regulations applicable to depreciation claims on capital expenditures. 20 C.F.R. § 405.415. Although these regulations were not referred to by the district judge in his charge to the jury,[6] they do not differ on this issue from those to which the judge did refer in his charge. That is, under either set of regulations the government provides reimbursement only to the extent that the expenditures were based on reasonable costs honestly arrived at. Thus, even under the regulations cited to us by appellant, for depreciable assets acquired after 1970 as those involved here, allowable depreciation could only be based on "historical cost" to the extent that such cost did not exceed the "lower of current reproduction cost . . . or fair market value at the time of purchase." 20 C.F.R. § 405.415(b)(1). "Fair market value" is defined in the next subsection, (b)(2), as "the price that the asset would bring by bona fide bargaining between well-informed buyers and sellers at the date of acquisition." In this case, there was bona fide bargaining, which produced the cost-plus contracts. The costs relied on by the hospitals in the reports, however, were not the costs that would have been incurred through honest performance of those contracts, but were costs that were inflated by fraud, and to the extent they were so inflated, the claims were not reimbursable. The hospitals' innocent statements that the costs were fully reimbursable were therefore false. On this view, we need not address the government's contention that even if the statements were not literally false, they were "fraudulent" within the meaning of section 1001.

Appellant next argues that the evidence was insufficient as a matter of law to establish that he "willfully cause[d]" the submission of the false statements to the government within the meaning of section 2(b). He argues that his purpose, if any, was only to defraud the hospitals, not the government. Appellant claims that he did not care about the hospitals' cost reports because they "played no role in the amount of money paid by the hospitals to the defendants . . . and even their filing *vel non* was a matter of total irrelevance and indifference to the defendants." Thus, he argues, in the absence of a criminal purpose or objective to cause a false statement to be made to the government, his convictions cannot stand, citing *United States v. Peoni*, 100 F.2d 401, 402–03 (2d Cir. 1938) (L. Hand). However, there was sufficient evidence from which the jury could infer that the filing of the false statements *was* a criminal purpose of appellant and that their filing was not a matter of indifference to him. There was plenty of evidence that from the outset Huber was familiar with the government hospital funding programs, which he knew would stimulate hospital activity and encourage expansion. The jury was entitled to infer that such funding, and the paper work that went with it, was essential to the prosperity of appellant's ongoing fraudulent business activities. This was not a one-time fraud that ended prior to the filing of any papers with the government by the hospitals.

Appellant's last objection to his false statement convictions is to the number of them. He was convicted on 19 counts, whereas, he argues, the activities alleged comprised at most six counts, i. e., one count for each of the six hospitals submitting depreciation claims to the government. Appellant's point is that since the historic cost figure reported to the government as the basis for each hospital's annual claim for depreciation was the same each year, there was, in effect, only one false statement for each hospital, which was merely repeated a number of times. In other words, appellant claims the convictions were multiplicitous, in that a single act was alleged to constitute several violations of

---

**6.** Appellant did not refer to the depreciation claims regulations either in his written requests to charge or in his exceptions to the charge.

the same statute. See *United States v. Israelski,* 597 F.2d 22, 24–25 (2d Cir. 1979). While such a question is rarely free from difficulty, we think appellant was correctly convicted on all 19 counts. Appellant was not charged with a given number of fraudulent schemes, but rather with having caused a certain number of false statements to be made. Had a hospital knowingly used an inflated historic cost as the basis for depreciation claims, it would have committed a separate violation with each annual claim. See *United States v. Bettenhausen,* 499 F.2d 1223, 1234 (10th Cir. 1974). Thus, appellant's convictions for having caused the submission of the 19 statements are affirmed.

■ Appellant next complains of the district judge's refusal to allow a defense witness to testify as an expert in the field of psychoanalysis, and that such refusal seriously interfered with appellant's ability to present his defense that because of his relationship with his father he was incapable of forming the mental state necessary to sustain the convictions. The witness did testify as a business expert. He is a professor of economics at Harvard Business School. He has also studied psychoanalysis at the Boston Psychoanalytic Institute, and, though he has had no medical training, is certified as a psychoanalyst by the American Psychoanalytic Institute. He has treated people regularly without supervision for a number of years. Judge Tenney heard the proffered testimony in the absence of the jury, and ruled the witness unqualified to testify as an expert concerning appellant's mental state. While we do not say that all of us would have ruled the same way, we hold that the district judge did not abuse his broad discretion in deciding that this witness was not qualified in this case. See, e. g., *Hamling v. United States,* 418 U.S. 87, 108, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974); *United States v. Bermudez,* 526 F.2d 89, 98 (2d Cir. 1975), cert. denied, 425 U.S. 970, 96 S.Ct. 2166, 48 L.Ed.2d 793 (1976). This is particularly so in light of the fact that two psychiatrists did testify as experts concerning appellant's mental state, and thus the defense based on appellant's

asserted lack of free will was presented to the jury.

Appellant challenges the sufficiency of the evidence on four of the mail fraud counts. These challenges are aimed at more than simply reversal of those convictions. Relying on a case in the Third Circuit for the proposition, appellant argues that if any of the mail fraud counts are reversed, the RICO count must be reversed as well, because it is impossible to know which mail fraud counts the jury relied on in finding the requisite "pattern of racketeering activity." *United States v. Brown,* 583 F.2d 659, 669 (3d Cir. 1978). We need not decide whether this circuit would agree with that analysis, cf. *United States v. Parness,* supra, 503 F.2d at 438 ("Convictions on any two of these [travel fraud] counts were sufficient under § 1961(5) to establish the 'pattern of racketeering activity' necessary for a conviction under § 1962(b)."), because the evidence was sufficient to sustain all the mail fraud counts submitted to the jury.

■ Appellant argues that as to two of the counts, 25 and 26, there was insufficient evidence of use of the mails. Those counts concerned checks paid by two of the hospitals to Medical Facilities. Officials from both hospitals testified that checks were typically mailed in the ordinary course of business. Although there was testimony that some checks were picked up by hand, they were identified as checks other than those specified in Counts 25 and 26. Witnesses could not recall whether any checks other than those identified were picked up by hand. This testimony of an alternative mode of delivery is simply too scanty, compare *United States v. Baker,* 50 F.2d 122, 123 (2d Cir. 1931) (testimony by lawyer that "a great many letters delivered by his office were not mailed"), to prevent the use of customary business practices as proof of mailing. See *United States v. Toliver,* 541 F.2d 958, 966 (2d Cir. 1976); *United States v. Fassoulis,* 445 F.2d 13, 17 (2d Cir.), cert. denied, 404 U.S. 858, 92 S.Ct. 110, 30 L.Ed.2d 100 (1971).

■ As to Counts 32 and 33, appellant claims that use of the mails by the hospital to deliver monthly payment requisitions to the New York State Department of Health came only after consummation of the fraudulent transactions, and thus could not have been "for the purpose of executing [a] scheme or artifice [to defraud]" within the meaning of 18 U.S.C. § 1341,[7] under *United States v. Maze*, 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974). Appellant's point is that all the invoices on which the requisitions were based had already been paid to one of appellant's entities by the hospital before the mailing. However, regardless of whether all of the invoices had already been paid, the mailing to obtain reimbursement was a part of this ongoing scheme to defraud. As stated earlier, the jury could find that government funding of hospital expansion was essential to the prosperity of appellant's fraudulent scheme. In *Maze,* supra, 414 U.S. 395, 94 S.Ct. 645, the defendant stole a credit card and fraudulently used it to obtain food and lodging at motels. The mails were used by the motels to obtain payment on invoices from banks. Maze's "scheme reached fruition when he checked out of the motel, and there is no indication that the success of his scheme depended in any way on which of his victims ultimately bore the loss." Id. at 402, 94 S.Ct. at 649. Further, the mailings there "increased the probability that [the] respondent would be detected and apprehended." Id. at 403, 94 S.Ct. at 650. Thus, in *Maze,* the mailings were not only not in furtherance of a scheme to defraud, they threatened to thwart it. Here, viewed realistically, the mailings were an integral part of Huber's fraudulent scheme. As stated earlier, the jury could find that the government funding was essential to generate the funds for hospital expansion on which the continuance of the illegal enterprise depended. See generally *United States v. Hasenstab,* 575 F.2d 1035, 1038–39 (2d Cir. 1978). Therefore, there was sufficient evidence that the mailings were in furtherance of a scheme to defraud.

■ Finally, appellant argues that his request for an order withdrawing several of the 18 specifications of perjury set forth in Count 40 should have been granted.[8] We have carefully reviewed the objections to each specification and find that the truthfulness of each was a question that was properly submitted to the jury. *United States v. Bonacorsa,* 528 F.2d 1218 (2d Cir.), cert. denied, 426 U.S. 935, 96 S.Ct. 2647, 49 L.Ed.2d 386 (1976). There was no "fundamental ambiguity or impreciseness in the questioning," id. at 1221, and we cannot say that any of the answers was literally true on its face.

For the reasons set forth above, we affirm the judgment of conviction in all respects.

---

7. In relevant part, 18 U.S.C. § 1341 provides:
    Whoever, having devised or intending to devise any scheme or artifice to defraud . . . ., for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

8. Appellant was charged with violating 18 U.S.C. § 1623, which provides in relevant part:
    (a) Whoever under oath in any proceeding before or ancillary to any court or grand jury of the United States knowingly makes any false material declaration . . . shall be fined not more than $10,000 or imprisoned not more than five years, or both.