**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Rex C. CAUBLE, Individually and doing business as Cauble Enterprises, Defendant-Appellant.**

**No. 82–2087.**

United States Court of Appeals, Fifth Circuit.

May 31, 1983.
Rehearing and Rehearing En Banc Denied Aug. 11, 1983.

---

Bruder & Cooper, Melvyn Carson Bruder, Dallas, Tex., Michael Tigar, Washington, D.C., for defendant-appellant.

Robert J. Wortham, U.S. Atty., Tyler, Tex., David B. Smith, Dept. of Justice, Appellate Section, Crim. Div., Washington, D.C., for plaintiff-appellee.

Before WISDOM, RUBIN and TATE, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

Rex C. Cauble appeals his conviction on a ten-count indictment charging him with violating the Racketeer Influenced and Corrupt Organizations statute (RICO) and the Travel Act and with misapplication of bank funds. Cauble, a wealthy Texas businessman, was in effect accused of being the range boss of the highly publicized "Cowboy Mafia," a loosely-knit group responsible for importing and distributing over 147,000 pounds of marijuana from 1976 through 1978.[1] The indictment charged Cauble with substantive violations of RICO[2] based on conduct of an enterprise through a pattern of racketeering activity and investment of income from racketeering activity in an interstate enterprise; conspiracy to violate RICO; three violations of the Travel Act,[3] and four counts of misapplication of bank funds.[4] The jury convicted him on all

---

1. The "Cowboy Mafia" included a number of Cauble Enterprises' employees and others. Its composition and exploits are chronicled in several of our earlier opinions. *See United States v. Ruppel,* 666 F.2d 261 (5th Cir.), *cert. denied,* —— U.S. ——, 102 S.Ct. 3487, 73 L.Ed.2d 1369 (1982); *United States v. Hamm,* 659 F.2d 624 (5th Cir.1981) (en banc); *United States v. Hawkins,* 658 F.2d 279 (5th Cir.1981).

2. (a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce. A purchase of securities on the open market for purposes of investment, and without the intention of controlling or participating in the control of the issuer, or of assisting another to do so, shall not be unlawful under this subsection if the securities of the issuer held by the purchaser, the members of his immediate family, and his or their accomplices in any pattern or [sic] racketeering activity or the collection of an unlawful debt after such purchase do not amount in the aggregate to one percent of the outstanding securities of any one class, and do not confer, either in law or in fact, the power to elect one or more directors of the issuer.

(b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section.
18 U.S.C. § 1962 (1976).

3. (a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—
 (1) distribute the proceeds of any unlawful activity; or
 (2) commit any crime of violence to further any unlawful activity; or
 (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,
and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

(b) As used in this section "unlawful activity" means (1) any business enterprise involving gambling, liquor on which the Federal excise tax has not been paid, narcotics, or controlled substances (as defined in section 102(6) of the Controlled Substances Act) or prostitution offenses in violation of the laws of the State in which they are committed or of the United States, or (2) extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States.

(c) Investigations of violations under this section involving liquor shall be conducted under the supervision of the Secretary of the Treasury.

18 U.S.C. § 1952 (1976).

4. Whoever, being an officer, director, agent or employee of, or connected in any capacity with any Federal Reserve bank, member bank, national bank or insured bank, or a receiver of a national bank, or any agent or employee of the receiver, or a Federal Reserve Agent, or an agent or employee of a Federal Reserve Agent or of the Board of Governors of the Federal Reserve System, embezzles, abstracts, purloins or willfully misapplies any of the moneys, funds or credits of such bank or any moneys, funds, assets or securities intrusted [sic] to the custody or

counts and found that Cauble's share of Cauble Enterprises should be forfeited. The trial judge imposed a five-year sentence on Count One and concurrent five-year sentences on the other counts and ordered the forfeiture. Cauble's appeal raises myriad challenges to the indictment, the sufficiency of the evidence adduced at trial, and the legality of the forfeiture. Having reviewed the sixteen-volume record, we conclude that the trial was fair, the evidence was sufficient, and the assertions of error are without merit. We, therefore, affirm the judgment of conviction and forfeiture.

## I. The RICO Claims

### A. Background

Congress adopted the Racketeer Influenced and Corrupt Organizations provisions[5] "to provide a blueprint for federal action against organized crime...."[6] Although it suffered initially from limited use, RICO is now a frequently-employed arrow in the federal prosecutor's crime-fighting quiver. RICO's application and effectiveness have been enhanced by the judicial consensus that it may be used even though no organized crime activity is charged[7] and by the Supreme Court's decision that it applies not only to legitimate enterprises conducted through a pattern of racketeering activity, but to wholly illegitimate enterprises as well.[8]

### 1. What RICO Prohibits

■ · RICO's purpose is "the imposition of enhanced criminal penalties and new civil sanctions to provide new legal remedies for all types of organized criminal behavior, that is, enterprise criminality—from simple political corruption to sophisticated white-collar crime schemes to traditional Mafia-type endeavors."[9] RICO does not, however, criminalize conduct that was legal before its enactment. Its application depends on the existence of racketeering activity violating some other criminal statute, state or federal.[10]

Section 1962(a) of the statute prohibits the use of illegally-derived funds to acquire or maintain an interest in an enterprise by

care of such bank, or to the custody or care of any such agent, officer, director, employee or receiver, shall be fined not more than $5,000 or imprisoned not more than five years, or both; but if the amount embezzled, abstracted, purloined or misapplied does not exceed $100, he shall be fined not more than $1,000 or imprisoned not more than one year, or both.

As used in this section, the term "national bank" is synonymous with "national banking association"; "member bank" means and includes any national bank, state bank, or bank and trust company which has become a member of one of the Federal Reserve banks; and "insured bank" includes any bank, banking association, trust company, savings bank, or other banking institution, the deposits of which are insured by the Federal Deposit Insurance Corporation.

18 U.S.C. § 656 (1976).

5. Organized Crime Control Act of 1970, Title IX, Pub.L. No. 91–452, 84 Stat. 922, 941 (codified at 18 U.S.C. §§ 1961–1968 (1976 & Supp. V 1981)).

6. Note, Elliott v. United States: *Conspiracy Law and the Judicial Pursuit of Organized Crime Through RICO,* 65 Va.L.Rev. 109, 109 (1979).

7. See Tarlow, *RICO: The New Darling of the Prosecutor's Nursery,* 49 Fordham L.Rev. 165, 175 & n. 48 (1980). This article, although generally critical of RICO, states that the courts' conclusion that an organized crime link is not required is persuasively supported by Congress' refusal to incorporate a definition of organized crime into RICO. See also Blakey & Gettings, *Racketeer Influenced and Corrupt Organizations (RICO): Basic Concepts—Criminal and Civil Remedies,* 53 Temp.L.Q. 1009, 1013–14 (1980) ·(RICO applies to all types of organized criminal behavior); cf. Note, *The Racketeer Influenced and Corrupt Organizations Act: An Analysis of the Confusion in its Application and a Proposal for Reform,* 33 Vand.L.Rev. 441, 441 n. 4 (1980) (organized crime describes "the different groups of individuals who supply illegal goods and services ... to countless numbers of citizen customers").

8. *United States v. Turkette,* 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981).

9. Blakey & Gettings, *supra* note 7, at 1013–14.

10. Thus Blakey and Gettings describe RICO as a "remedial" rather than a "criminal" statute. *See id.* at 1021 n. 71.

legal means.[11] Section 1962(c) proscribes the illegal use of an enterprise. Section 1962(d) makes illegal a conspiracy to violate RICO's substantive provisions, requiring the government to prove that the defendant agreed to participate in the enterprise's affairs through a pattern of racketeering. Each section requires that the enterprise affect interstate commerce.

The government establishes a § 1962(a) violation by proving the existence of an enterprise, the defendant's derivation of income from a pattern of racketeering activity, and the use of any part of that income in acquiring an interest in or operating the enterprise. The government establishes a § 1962(c) violation by proving the existence of an enterprise, the defendant's employment by or association with that enterprise, and the defendant's conduct of or participation in the conduct of the enterprise's affairs through a pattern of racketeering activity.[12] Because this case requires us to examine the proof necessary to demonstrate both the existence of an enterprise and the connection of a defendant to it, we discuss each element briefly.

### 2. Enterprise

■ The statute states: " 'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." [13] The Supreme Court has held that this language encompasses both wholly legal entities and completely illegal associations-in-fact.[14] But "[t]he 'enterprise' is not the 'pattern of racketeering activity'; it is an entity separate and apart from the pattern of activity in which it engages." [15] Therefore, in every case the government must prove not only that there was a pattern of racketeering activity but that it was conducted through an enterprise as thus defined.

In this case the indictment charged that Cauble Enterprises, a legal partnership consisting of Cauble, his wife, and his son, was the enterprise used in violation of both §§ 1962(a) and (c).[16]

### 3. Pattern of Racketeering Activity

The statute defines a "pattern of racketeering activity" as "at least two acts of racketeering activity ... the last of which occurred within ten years ... after the commission of a prior act of racketeering activity." [17] "Racketeering activity" includes an array of crimes that violate either state or federal law.[18]

### 4. Nexus Between the Enterprise and the Racketeering Activity

■ RICO criminalizes the conduct of an enterprise through a pattern of racketeer-

---

11. Section 1962(b) forbids the takeover of an enterprise by the use of illegal means. Cauble was not charged under this section.

12. *United States v. Kopituk,* 690 F.2d 1289 (11th Cir.1982); *United States v. Phillips,* 664 F.2d 971, 1011 (5th Cir.1981), *cert. denied,* —— U.S. ——, 103 S.Ct. 208, 74 L.Ed.2d 166 (1982).

13. 18 U.S.C. § 1961(4) (1976).

14. *Turkette,* 452 U.S. at 592, 101 S.Ct. at 2533, 69 L.Ed.2d at 260.

15. *Id.* at 583, 101 S.Ct. at 2528–29, 69 L.Ed.2d at 255. The court stated that an enterprise is "an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct." *Id.* at 583, 101 S.Ct. at 2528, 69 L.Ed.2d at 254.

16. In *United States v. Stratton,* 649 F.2d 1066, 1075 (5th Cir.1981), we held that the prosecution need not specify whether the enterprise is a "legal entity" or a "group of individuals associated in fact although not a legal entity" because "there is no logical or statutory reason to force the government to choose between alternative enterprise theories as long as the indictment is otherwise sufficient." (citation omitted). When, however, the indictment makes clear that the government is proceeding on the theory that the enterprise is one or the other of these two kinds of enterprise, it must prove the existence of "the associational enterprise on which [it] rested its case." *United States v. Lemm,* 680 F.2d 1193, 1198 (8th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 739, 74 L.Ed.2d 960 (1983).

17. 18 U.S.C. § 1961(5) (1976).

18. *Id.* § 1961(1) (Supp. V 1981). The racketeering activity alleged in this case included "dealing in narcotic or other dangerous drugs," *id.,* and Travel Act violations.

ing activity and not merely the defendant's engaging in racketeering activity.[19] Therefore, there must be a nexus between the enterprise, the defendant, and the pattern of racketeering activity. The mere fact that a defendant works for a legitimate enterprise and commits racketeering acts while on the business premises does not establish that the affairs of the enterprise have been conducted "through" a pattern of racketeering activity.[20] Similarly, a defendant's mere association with a lawful enterprise whose affairs are conducted through a pattern of racketeering activity in which he is not personally engaged does not establish his guilt under RICO.[21]

In several opinions we have discussed the requirement that there be a nexus between the enterprise and the racketeering activity. We have not, however, formulated a test to determine whether the requisite nexus has been established by the government's proof.[22] Even in our most recent discussion of legal enterprises, *United States v. Dozier,* 672 F.2d 531 (5th Cir.), *cert. denied,* ——

U.S. ——, 103 S.Ct. 256, 74 L.Ed.2d 200 (1982), we did not define the nexus required but concluded that "the nexus is clear" because "[o]nly [the defendant's] position in the [enterprise] and his control over its affairs enabled him to hawk its services for personal gain." 672 F.2d at 544.

■ Two courts have held that the test for determining whether the government has met the nexus requirement is whether it has proved that "(1) [the defendant] is enabled to commit the predicate offenses solely by virtue of his position in or control over the affairs of the enterprise, or (2) the predicate offenses are related to the activities of that enterprise."[23] This test appears to us essentially to combine the two required connections under part (1) of the inquiry. Because the enterprise-racketeering nexus should be distinct from the defendant-racketeering connection, we find it necessary to modify this formulation. A defendant does not "conduct" or "partici-

---

**19.** *Phillips,* 664 F.2d at 1011 (gravamen of RICO offense is conduct of an enterprise through a pattern of racketeering activity); *United States v. Martino,* 648 F.2d 367, 381 (5th Cir.1981) (RICO proscribes the furthering of the enterprise, not the predicate acts), *cert. denied,* 456 U.S. 949, 102 S.Ct. 2020, 72 L.Ed.2d 474 (1982).

**20.** *See, e.g., United States v. Dennis,* 458 F.Supp. 197 (E.D.Mo.1978) (defendant's employment by General Motors Assembly Division and collection of unlawful debts on its premises failed to establish nexus), *aff'd,* 625 F.2d 782 (8th Cir.1980).

**21.** For example, in *United States v. Barber,* 668 F.2d 778 (4th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 66, 74 L.Ed.2d 67 (1982), the enterprise charged was the West Virginia Alcoholic Beverage Control Commission. The defendant, a Commission official from 1969 to 1973 and Commissioner from 1973 until 1976, was convicted of manipulating the "withdrawal" and "breakage" rules to obtain free liquor for himself and others. If, however, the proof had shown that subordinate Commission employees manipulated these rules to get liquor without the defendant's knowledge, consent, or participation, he could not have been convicted under RICO. This is because, although the Commissioner would have "conducted" the affairs of a RICO "enterprise," he would not have done so "through" a pattern of racketeering activity.

**22.** We stated in *Martino* that the predicate crimes must be "related to the affairs of the enterprise." 648 F.2d at 403. In *United States v. Welch,* 656 F.2d 1039, 1061 (5th Cir.1981), *cert. denied,* 456 U.S. 915, 102 S.Ct. 1768, 72 L.Ed.2d 173 (1982), we stated that there must be "a relation between the predicate offenses and the affairs of the enterprise." We added: "Congress intended only to require a sufficient nexus between the racketeering activities and the affairs of the enterprise." 656 F.2d at 1062. *See also United States v. Hartley,* 678 F.2d 961, 991 (11th Cir.1982) (applying *Martino* formulation; "no difficulty in finding a sufficient nexus between the deceptive activities employed by the defendants ... and the common everyday affairs of the enterprise ...."), *cert. denied,* —— U.S. ——, 103 S.Ct. 815, 74 L.Ed.2d 1014 (1983).

**23.** *United States v. Provenzano,* 688 F.2d 194, 200 (3d Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 492, 74 L.Ed.2d 634 (1982); *United States v. Scotto,* 641 F.2d 47, 54 (2d Cir.1980), *cert. denied,* 452 U.S. 961, 101 S.Ct. 3109, 69 L.Ed.2d 971 (1981). The *Scotto* Court held it unnecessary to show that the defendant enhanced or solidified his position in the enterprise through commission of the predicate violations. 641 F.2d at 54. That question is not raised by this case and we need not address it.

pate in the conduct" of a lawful enterprise's affairs, unless (1) the defendant has in fact committed the racketeering acts as alleged; (2) the defendant's position in the enterprise facilitated his commission of the racketeering acts, and (3) the predicate acts had some effect on the lawful enterprise.[24]

### B. *Challenges to the Indictment*

■ Cauble challenges each RICO count on the ground that it fails to state an offense against the United States.[25] Count One of Cauble's indictment, the conspiracy charge, details the predicate offenses and overt acts with great specificity. It alleges that as part of the conspiracy Cauble Enterprises' "lands, buildings, automobiles, aircrafts [sic], employees and assets" would be used. It then lists thirty-seven overt acts, alleging that Cauble and Cauble Enterprises loaned money to, financed travel by, and provided ranches and an airplane for use by the conspirators. Cauble nonetheless contends that this count is defective because its charging portion does not include references to the particular means by which

Cauble Enterprises' affairs were conducted through a pattern of racketeering activity. He also contends that the allegation that he acted "individually and doing business as Cauble Enterprises" "leaves a question whether some agency theory more arcane than contemplated by 18 U.S.C. § 2 is being invoked."[26] Finally, he charges that the count is too vague to permit a clear answer.

■ The indictment's purpose is to inform the accused of the charges; it must be read in the light of that purpose. An indictment is sufficient if it contains the elements of the offense charged, fairly informs the defendant what charge he must be prepared to meet, and enables the accused to plead acquittal or conviction in bar of future prosecutions for the same offense. *Stratton,* 649 F.2d at 1073.

In *Stratton,* the defendant argued that the indictment was defective because it alleged too broad an enterprise. We stated: "The agreements which were part of the alleged conspiracy, the 'overt acts' in furtherance of the conspiracy, and the substan-

---

**24.** The effect may be direct, such as the deposit of money in the enterprise's bank account, or indirect, such as the retention of the enterprise's existing clients. The government need not prove that the racketeering activity "benefitted" or "advanced the affairs of" the enterprise. *See Hartley,* 678 F.2d at 990–91; *Welch,* 656 F.2d at 1062; *cf. United States v. Webster,* 669 F.2d 185, 187 (4th Cir.) (modifying earlier opinion holding that enterprise's affairs must be benefitted), *cert. denied,* 456 U.S. 935, 102 S.Ct. 1991, 72 L.Ed.2d 455 (1982). Nor must the government demonstrate that the enterprise itself was corrupt or that it authorized the defendant's conduct. The prosecution need prove only that the racketeering acts affected the enterprise in some fashion.

Of course, if the defendant exercised such control over the legal enterprise as to make his acts the acts of the enterprise, proof of the defendant's commission of racketeering acts satisfies both nexuses. In that event the defendant's connection with the racketeering acts is also the enterprise's connection. This is "conduct" of a legal enterprise through a pattern of racketeering activity. *Cf. Martino,* 648 F.2d at 382 ("conducts" simply means performance of activities necessary or helpful to operation of enterprise).

**25.** Although this claim was not raised in the district court, we consider it on appeal because a challenge to the indictment's sufficiency may

be raised at any time. *United States v. Meacham,* 626 F.2d 503 (5th Cir.1980); *see* Fed.R. Crim.P. 12(b)(2). When the question is not raised below, however, we construe the indictment liberally and will not reverse unless it cannot within reason be construed to charge a crime. *United States v. Hart,* 640 F.2d 856, 857–58 (6th Cir.), *cert. denied,* 451 U.S. 992, 101 S.Ct. 2334, 68 L.Ed.2d 853 (1981).

**26.** 18 U.S.C. § 2 (1976) deals with liability of principals. The indictment charges Cauble individually and doing business as Cauble Enterprises. It charges that Cauble Enterprises was a limited partnership in which Rex C. Cauble was general partner. The indictment does not charge Cauble Enterprises with any corrupt or criminal conduct. Hence the designation of Cauble "doing business as Cauble Enterprises" further identifies the individual and particularizes the charge by showing in what guise he engaged in the conspiracy. *See United States v. Zitomer,* 251 F.Supp. 357, 359 (D.Conn.1966) (and cases cited therein). We see neither error nor arcane agency principle in this form of indictment. *See United States v. Cappetto,* 502 F.2d 1351 (7th Cir.1974) (civil injunction), *cert. denied,* 420 U.S. 925, 95 S.Ct. 1121, 43 L.Ed.2d 395 (1975).

tive racketeering offenses are all related in great detail." *Id.* We, therefore, concluded that the indictment left no room for doubt about the charges lodged against each defendant and protected them from double jeopardy.

■ Count One of this indictment, whose detail we have already summarized, is sufficient to inform Cauble of the charges against him and to permit him to answer these charges. Furthermore, the list of overt acts adequately specifies the means by which Cauble Enterprises' affairs were conducted through a pattern of racketeering activity.

■ Count Two, brought under § 1962(a), charges Cauble with aiding and abetting six incidents of marijuana smuggling and with committing or aiding and abetting various acts of travel as part of a pattern of racketeering activity. It charges that Cauble received income from these activities and invested it in Cauble Enterprises. Cauble claims that this count fails to state an offense because it can be read consistently with innocence and fails to give notice of the amount of racketeering income invested in the enterprise and the nature of its investment.

The indictment charges Cauble with investing income derived from racketeering activity in an interstate enterprise. It lists the acts alleged as the pattern of racketeering activity. These are the essential elements of the offense charged.

Cauble nevertheless contends that the indictment did not put him on notice of the "source, amount, and nature of the 'income' . . . and the destination, amount and nature of the 'investment' . . . ." But the substan-

tive offense charged is the "investment" of "income" in an enterprise and the indictment's wording makes clear that this is the charge against which Cauble must defend. The defendant is entitled to a "plain, concise statement of the *essential* facts constituting the offenses charged," [27] but the indictment need not set forth every evidentiary detail necessary to establish the elements of the offense.[28]

■ Count Three, brought under § 1962(c), charges Cauble with conducting the affairs of Cauble Enterprises through a pattern of racketeering activity and incorporates by reference the allegations in Count Two that Cauble aided and abetted smuggling and acts of criminal travel. It thus puts Cauble on notice first that he is charged with conducting Cauble Enterprises' affairs through a pattern of racketeering and second that the acts of racketeering are those set forth in Count Two. Cauble argues that this count is vague because it fails to explain how its allegations are related to the holdings of Cauble Enterprises sought to be forfeited. The indictment is clear to all but the captious. It plainly and concisely states the charge and that suffices.[29]

■ Cauble contends that Count Two, charging investment in the enterprise, and Count Three, charging conduct of the enterprise, are multiplicitous.[30] Rule 12(b)(2) requires that defenses and objections based on defects in the indictment be raised before trial. In *United States v. Bradsby,* 628 F.2d 901, 905–06 (5th Cir. 1980), we held that a failure to raise the multiplicity argument before trial did not waive the right to object to multiple sentences. We reasoned that the defendant

---

**27.** *United States v. Williams,* 679 F.2d 504, 508 (5th Cir.1982) (emphasis added), *cert. denied,* —— U.S. ——, 103 S.Ct. 742, 74 L.Ed.2d 963 (1983).

**28.** *Williams,* 679 F.2d at 508; *see* 1 L. Orfield, Criminal Procedure Under the Federal Rules § 7.53 (1966).

**29.** Cauble also claims that there was a fatal variance between the indictment and the proof of the "enterprise." We consider that conten-

tion *infra* in our discussion of evidentiary sufficiency, for our rule is that the issue of variance is waived if not presented to the district court. *See United States v. Lerma,* 657 F.2d 786 (5th Cir.1981), *cert. denied,* 455 U.S. 921, 102 S.Ct. 1279, 71 L.Ed.2d 463 (1982); Fed.R.Crim.P. 12(b)(2).

**30.** Multiplicity is charging a single offense in more than one count. *United States v. DeLa Torre,* 634 F.2d 792, 794 (5th Cir.1981).

should not be forced to serve an erroneous sentence imposed on each count of a multiplicitous indictment because of waiver.

In this case, however, Cauble received a concurrent sentence on the allegedly multiplicitous counts. Therefore, this claim is arguably waived.

■ Even if not waived, this contention lacks merit. To sustain a conviction on Count Two the government must prove that the defendant derived and invested income. To convict on Count Three the government must satisfy the three-pronged test we have set out above.[31] These are plainly different offenses, requiring proof of different elements, so the counts are not multiplicitous.[32]

## C. The Evidence[33]

■ The government's proof focused on a series of smuggling episodes involving the shrimp boats MONKEY, JUBILEE, BAYOU BLUES, and AGNES PAULINE and their connection to Cauble's trusted ranch foreman, Charles "Muscles" Foster.[34] The issue, as both trial counsel repeatedly stressed to the jury, was whether Cauble knew of the smuggling activities; no one contested that the smugglers used many of Cauble Enterprises' assets. Much of the government's evidence came from the mouths of "Cowboy Mafia" members and former Cauble Enterprises employees.

**1. January-February 1977: the Preliminaries**

Raymond Hawkins, a confessed drug smuggler, met Foster in 1972 and the two became reacquainted in 1976.[35] Foster flew by commercial airliner to Thomasville, Georgia, near Hawkins' home, on February 1, 1977; Cauble Enterprises paid for the ticket. When Cauble made a $25,000 loan to Foster from Cauble Enterprises' funds on February 9, 1977, Foster told Cauble that the money was to be reloaned to Hawkins. Hawkins flew to New Jersey the next day to lease trucks to haul marijuana. Cauble Enterprises paid for the ticket and Hawkins used all or part of the $25,000 to pay for the trucks.[36] Foster helped unload marijuana from the MONKEY on or about February 21, 1977.

**2. February-June 1977: the MONKEY**

The smugglers decided to move the operation from Georgia to Texas. Hawkins met with Foster and Carlos Gerdes[37] several times to plan the new operation; Foster flew to these meetings aboard Cauble Enterprises' private plane.

On February 26, 1977, Foster, Gerdes, Cauble, and Ms. Fern Lynch flew from Denton to Houston; Cauble and Ms. Lynch deplaned in Houston and Cauble told the pilot to continue to Orange. On March 2, 1977, Foster flew to Thomasville to meet

31. *See supra* text accompanying note 24.

32. *See generally Phillips,* 664 F.2d at 1014; *Martino,* 648 F.2d at 382–83. In both of those cases we rejected the contention that counts charging "conducting" and "conspiracy to conduct" were multiplicitous despite "considerable overlap in the evidence . . . ." *Martino,* 648 F.2d at 383. These counts, by contrast, overlap only in that the government must prove the existence of an enterprise affecting interstate commerce.

33. In reviewing a jury verdict of guilty, we view the evidence and all reasonable inferences from the evidence in the light most favorable to the government. *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Beason,* 690 F.2d 439, 442 (5th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 828, 74 L.Ed.2d 1023 (1983).

34. Foster was a defendant in *Ruppel.* He was acquitted by reason of insanity. *See* 666 F.2d at 266.

35. A load of marijuana arrived aboard the MONKEY in October 1976. The government did not charge that Cauble was involved with that load. Hawkins' story is related in detail in *United States v. Hawkins,* 658 F.2d 279 (5th Cir.1981).

36. Cauble Enterprises loaned Foster $6,000 more on February 22, 1977.

37. Gerdes was also known as Carlos San Ramon. He was convicted and the conviction was affirmed by this court. *United States v. Hawkins,* 658 F.2d 279 (5th Cir.1981).

Hawkins and Gerdes. Gerdes gave Foster $250,000 cash for setting up the Texas operation.[38] On March 4, Foster repaid his $31,000 debt to Cauble Enterprises.

From March through May Cauble Enterprises loaned Foster $18,000. Cauble Enterprises also paid for Foster's travel to Houston on May 11–13, 1977. The proceeds of a loan made on May 11 were used to reimburse Hawkins for building a privacy fence at Sneed's Shipyard in Orange, Texas, where the MONKEY was to arrive.

The MONKEY arrived in Orange on May 31, 1977. Foster had arranged for trucks and drivers[39] to haul the load to the L.R. Ranch near Meridian, Texas. The L.R. Ranch is owned by Cauble Enterprises. Foster paid the ranch foreman to take a vacation and the smugglers used the ranch for approximately two weeks in distributing the marijuana.[40]

Hawkins decided to move to Texas because smuggling was becoming more difficult in Florida and Georgia. He agreed to buy the Cherokee Ranch from Cauble Enterprises and paid Cauble $100,000 down, in cash, which Cauble agreed not to report on his income tax return.[41] Hawkins also testified that he met Foster, Cauble, and Ms. Lynch in Cauble's bedroom three weeks after the MONKEY arrived and paid Foster $250,000 in Cauble's presence; Foster then gave Cauble the money.[42]

### 3. June 1977—May 1978: the BAYOU BLUES

After he split with Gerdes, Hawkins set up his own marijuana smuggling venture. He bought the BAYOU BLUES through Martin Sneed, Sr.[43] He and Foster used the Cauble Enterprises plane to set up the deal.[44]

**38.** Foster showed a valise containing the money to pilot William McKesson, who testified that Foster stated: "Mr. Cauble knows [about the smuggling], but he just doesn't ask questions." McKesson claimed that he quit the job two days later. The defense impeached McKesson with his grand jury testimony that he "assumed that Mr. Cauble knew, but as far as he [Foster] saying that Mr. Cauble knew, he didn't say that." It also presented testimony that McKesson was fired for poor flying and that he flew Cauble Enterprises' plane after the day on which he claimed that he resigned.

**39.** The drivers were Willis Butler and Charles Talkington. Talkington pleaded guilty. Butler committed suicide.

**40.** While the group was at the L.R. Ranch, Hawkins had a dispute with Gerdes and Foster and left the group. Hawkins gave a pretrial statement in which he referred to a disagreement over his share and expressed the view that the smugglers were taking too many risks. He testified at trial, however, that he left the group because he thought that Gerdes was relying more on Foster's advice than on his.

**41.** The date of this payment is unclear on the record. The government in brief states that it occurred at the "bedroom counting session." See infra note 42 & accompanying text. Hawkins' pretrial statement indicated that he made the payment about April 4, 1977. His testimony was that he made the payment at the counting session "approximately three weeks after the MONKEY came in."

**42.** Hawkins' statement was that Foster handed two piles of $125,000 to Cauble, saying of the second "this is your half." His trial testimony dwelled only on Foster's handing Cauble the money until the prosecutor refreshed his recollection about Foster's words.

Cauble denied that the meeting took place. On appeal, defense counsel also suggests that there is a question whether, if Cauble received the money, he did so as a bailee for Foster or as a principal. We do not see the relevance of this distinction; if the meeting occurred and Cauble was present, his knowledge of illegal activity afoot can hardly be doubted.

Hawkins also testified that: he told Cauble he was a drug smuggler; he smoked marijuana in Cauble's presence; he discussed smuggling with Ms. Lynch and Cauble; he gave Ms. Lynch marijuana cigarettes on one occasion; Cauble warned him that Foster was talking too much; and Foster told him several times that Cauble knew that Cauble Enterprises' ranches were being used for smuggling activities.

**43.** Sneed, Sr. owned Sneed's Shipyards, where the MONKEY had landed. He was convicted and his conviction was affirmed on appeal. *United States v. Hawkins*, 658 F.2d 279 (5th Cir.1981).

**44.** Cauble required Foster and Hawkins to pay for using the plane. Cauble wrote "bills" by hand.

On September 12, 1977, Cauble flew to Las Vegas with Hawkins and others.[45] Cauble arranged for Hawkins to launder $100,000 and, on his return to Denton, deposited the money in Hawkins' account at the Western State Bank.

On May 2, 1978, the BAYOU BLUES arrived at Sneed's Shipyard in Orange, Texas. Foster became involved in transporting and storing the marijuana at the last minute when one of the trucks did not appear. The smugglers took the marijuana to the Crockett Ranch in Crockett, Texas, which is owned by Cauble Enterprises. The next day, however, Foster told Hawkins to get the truck off the ranch. Also on May 2, Foster flew to Tampa at Cauble Enterprises' expense to buy a small boat.

On May 4, 1978, Cauble flew to Las Vegas. Foster had told Willis Butler, whom he owed $50,000, that Butler could have the money in old bills or "the old man can go to Las Vegas and clean it up for you." Butler received $50,000 in new $100 bills and later used some of them to pay his lawyer. Twenty-five of the bills had been delivered by the Federal Reserve Bank to the Valley Bank of Nevada on May 4, 1978.

4. June 1977—April 1978: the JUBILEE

While the BAYOU BLUES operation was underway, Gerdes' organization was also planning more smuggling ventures. On July 20, 1977, Gerdes, Foster, and others flew to Las Vegas aboard Cauble Enterprises' plane to launder money.[46] Gerdes and others returned to Texas on July 26 and had breakfast with Cauble at Cauble's home;

Cauble ordered the Cauble Enterprises pilot to fly Gerdes to his home in Knoxville, Tennessee.

Gerdes' organization sought a new boat in October 1977. Foster was looking for a boat at the same time, allegedly to begin a shrimping business. Cauble called two boat brokers on October 5, 1977, seeking a shrimp boat, and later sent Foster to look at a boat in Aransas Pass, Texas. Gerdes' lieutenants bought the JUBILEE in November 1977, after meeting Foster while looking for a suitable boat.[47]

The JUBILEE smugglers met in November 1977 at a Houston apartment leased by Cutter Bill's Western Wear, a business owned by Cauble Enterprises. In late 1977 Foster asked Cauble's lawyer's assistance in leasing a site suitable for a shrimping operation. The lawyer and Foster looked at several places and in January 1978 rented a site at High Island, Texas.[48] Foster had a large metal structure built at the water's edge.

On December 26, 1977, Foster flew aboard Cauble Enterprises' plane to Sarasota and picked up Gerdes. They then flew to Memphis and on to Houston; from there they boarded a commercial plane and flew to Las Vegas. On December 30 Cauble flew to Las Vegas. On January 1, 1978, Cauble delayed his party's takeoff from Las Vegas to converse with Gerdes at the airport.

The JUBILEE arrived at High Island on January 27, 1978. Eight smugglers, including Gerdes, Foster, and three Cauble Enter-

---

**45.** Hawkins paid Cauble about $3,200 for this plane trip.

**46.** Pilot Crownover testified that he was left alone for six days. When Crownover called Cauble for instructions, Cauble explained that he did not really know what was going on but told Crownover to "hang tight." Cauble Enterprises' phone log of incoming calls for this time was missing.

**47.** The three met in Corpus Christi, en route to Aransas Pass, and again in Bayou La Batre, Alabama. Foster flew to Mobile, Alabama, the closest airport to Bayou La Batre, aboard the

Cauble Enterprises plane on November 5, 1977. A "Mr. Carlos" telephoned Cauble on November 4, 5, and 7, 1977.

**48.** The owner of the High Island property told the attorney and Foster that it was unsuitable for a shrimping operation because it was too far from the Gulf, lacked facilities, and had no source of clean water for making ice. He and his brother later received $15,000 from Foster, allegedly as salary and reimbursement for funds spent on materials and labor in building a fishhouse and drilling a well at High Island.

prises' employees [49] awaited the JUBILEE's arrival for a week at the Cutter Bill's apartment. The marijuana was unloaded and driven to the Crockett Ranch. Butler and Washington then took one truckload to the Mercer Ranch, near Fort Worth.[50] Cauble Enterprises also owns the Mercer Ranch. The smugglers distributed the marijuana from the Crockett Ranch during the next two weeks.

During February and March 1978, the Cauble Enterprises plane made three trips to Alcoa, Tennessee, near the home of John Ruppel.[51] On March 21, 1978, Foster and Gerdes flew by commercial aircraft to Memphis and Cauble Enterprises paid their fare.

On April 4, 1978, the JUBILEE arrived at High Island. For the week before its arrival the smugglers had again resided at the Cutter Bill's apartment. Butler and Washington again trucked the marijuana to the Crockett Ranch and the smugglers distributed it during the next two weeks.

In April or May 1978 Larry Washington called Cauble to find out whether Foster had left Washington $5,000 due him from the second JUBILEE load. Washington asked whether Foster had left a package for him and Cauble said: "No. What was it?" Washington replied: "Money." Cauble told Washington to come to the ranch for the money. When he arrived, Cauble gave him a briefcase, which Washington had given to Foster, containing $5,000; Cauble asked Washington if it was a loan or if Foster owed him the money.

### 5. June–November 1978: the AGNES PAULINE

During June and July 1978, Foster flew to Tampa, Florida, Beaumont, Texas, and Knoxville, Tennessee, at Cauble Enterprises' expense. Foster, Butler, Washington, and James Holland discussed smuggling another load of marijuana in August 1978.

During August or September 1978, Cauble told Washington that Carlos had called to warn Cauble that Foster was talking too much and to say that he "didn't want to do any more business with" Foster. Cauble also warned Butler and Washington not to have any more dealings with Foster. Foster disappeared during August 1978.

The AGNES PAULINE arrived in Port Arthur, Texas, on November 29, 1978. It was seized by agents of the Drug Enforcement Administration.

### 6. The Cash Deposits

During late 1976 and early 1977, Cauble Enterprises was burdened with debt. The partnership lost money during each of the years involved here except 1978, in which it broke even. In January 1978 Cauble Enterprises' special account at Western State Bank was $100,000 overdrawn; it also showed a deficit balance on March 1, 1978.

On April 8, 1978, Cauble flew to Las Vegas to play in the World Series of Poker. He lost his $10,000 entry fee but, when he returned to Texas, he told John Gray, Chairman of the Board of the Dallas International Bank, that he had won $260,000 in a side game and wanted it worked into his accounts at the bank.[52] Gray suggested

---

**49.** Butler, Talkington, and Larry Washington.

**50.** The Mercer Ranch was much-discussed after the second JUBILEE load. A smuggler known as "Big Nose" opened every sack of marijuana in the truck and some marijuana spilled and was left at the ranch. Foster told Larry Washington that the Texas Rangers had found the marijuana and that he would have to pay a judge $10,000 to get the heat off.
Texas State Judge Byron Matthews told Cauble of a rumor that marijuana residue had been found at the Mercer Ranch. Cauble called Foster in and told him that a Texas Ranger had told Judge Matthews that there was marijuana at the Mercer Ranch. Foster denied knowing

anything about it and this denial satisfied Cauble that the report was untrue.

**51.** Ruppel was convicted on several charges in connection with the smuggling schemes. We affirmed his convictions in *United States v. Ruppel*, 666 F.2d 261 (5th Cir.), *cert. denied*, —— U.S. ——, 102 S.Ct. 3487, 73 L.Ed.2d 1369 (1982).

**52.** At that time Cauble, either individually or through Cauble Enterprises, owned 20% of Dallas International Bank's stock. He later gained control of 55% of the bank's stock.

that Cauble take the money to "his own bank in Denton."[53]

At Western State Bank, Cauble Enterprises was on a list of persons and businesses exempt from the requirement that all cash deposits exceeding $10,000 be reported to the Internal Revenue Service.[54] Cauble Enterprises deposited $113,900 cash to its Western State Bank Special Account in April 1978; $182,000 cash in May, and $124,300 cash in June. Cash deposits in 1978 totaled more than $692,000; cash deposits in 1977 amounted to approximately $220,000; in 1976 cash deposits were $14,600.[55]

### D. Challenges to the Evidence

### 1. The Predicate Acts

■ Cauble contends that the proof of the RICO predicate offenses was insufficient because the government failed to prove beyond a reasonable doubt that he aided and abetted either the smuggling episodes or the acts of travel. In determining whether the evidence is sufficient, we inquire whether a reasonable juror might have been convinced of the defendant's guilt beyond a reasonable doubt.[56]

■ To prove a person guilty of aiding and abetting, the government must show that the defendant associated himself with an unlawful venture, participated in it with the desire of accomplishing the illegal end, and sought by his actions to make it succeed.[57] The defendant must intend to commit the offense and participate in some manner to aid its commission, but need only aid and abet, rather than commit, each element of the crime.[58]

■ Cauble's brief states that the proof "nowhere discloses" that he was or could have been aware of any of the specific smuggling episodes or of the purpose of the airplane flights. This assertion is flatly contradicted by the record.

Both Hawkins and Washington testified that, in their opinion, Cauble knew about the smuggling. McKesson testified that Foster told him that Cauble knew about the smuggling. Although this evidence was contradicted, a reasonable juror might have believed it.

Furthermore, there was voluminous circumstantial evidence of Cauble's knowledge. This included several large loans to Foster from Cauble Enterprises, including one that was to be reloaned to Hawkins; Cauble's communications with Carlos Gerdes; his trips to Las Vegas; his paying for Foster to look for a boat; and his making significant changes in the business practices of Cauble Enterprises during the years in which the smuggling occurred.[59] There

---

**53.** Cauble or Cauble Enterprises owned 87% of the shares of the Western State Bank of Denton.

**54.** See 31 U.S.C. § 1081 (1976); 31 C.F.R. § 103.22 (1981). Hawkins and Foster were also on this exempt list.

**55.** Total cash deposits in 1979 amounted to $100,700. This figure included an $80,000 deposit on January 9, 1979. The deposit slip stated that this amount was the remainder of Hawkins' down payment on the Cherokee Ranch.

Many of the carbon copies of deposit slips Cauble Enterprises turned over to the grand jury in response to its subpoena had hand- or typewritten notes explaining the source of the cash, such as "cattle sales" and "gambling winnings." These notations did not appear on the bank's original deposit slips. For example, a deposit slip dated March 17, 1978, for $20,700 carried the notation "Down Payment on Sale of Cherokee Ranch to Raymond Hawkins." Cauble testified that the deposit was unrelated to

the Cherokee Ranch sale but that he "may have" instructed the bookkeeper to type the information on the slip.

**56.** United States v. Bell, 678 F.2d 547, 549 (5th Cir.) (en banc), cert. granted on other grounds, —— U.S. ——, 103 S.Ct. 444, 74 L.Ed.2d 600 (1982).

**57.** United States v. Ballard, 663 F.2d 534, 542–43 (5th Cir.1981), modified, 680 F.2d 352 (5th Cir.1982) (per curiam).

**58.** United States v. Fischel, 686 F.2d 1082, 1087 (5th Cir.1982).

**59.** There was, for example, testimony that Foster never flew on the Cauble Enterprises' airplane without Cauble before late 1977. There was also evidence that Cauble Enterprises had cash deposits of only some $14,600 in 1976 as opposed to $200,000 in 1977 and $692,000 in 1978.

was also repeated testimony that only Cauble could authorize the use of the airplane. One pilot was dismissed for flying the plane to have it cleaned without Cauble's permission. This testimony provided support for the possible inference that Cauble knew of the various uses of the plane.

A reasonable jury might have concluded on the record evidence that Cauble knew of the drug-smuggling activities and knew the purpose of the acts of travel. Having reached the decision to reject Cauble's lack-of-knowledge defense, it might have concluded that Cauble was associated with, participating in, and seeking the success of a series of smuggling incidents. It might have decided that activities leading up to the ultimate acts of smuggling included the many acts of travel charged. In short, we are unable to say that a reasonable person would necessarily have entertained a reasonable doubt, after hearing the government's proof, that Cauble aided and abetted the acts of travel and the smuggling.

### 2. The Enterprise Element

Cauble argues that all of his RICO convictions must be set aside because the government failed to prove that he was in any way culpably connected with any enterprise. We treat this as a challenge to both the government's proof that there was a RICO enterprise and that there was a nexus between the enterprise, the racketeering activities, and Cauble.

Cauble contends that the government's proof demonstrated only that the racketeer-ing activities were committed by and related to an enterprise-in-fact, the "Cowboy Mafia." Thus, he suggests, the government failed to adduce sufficient evidence to show that Cauble Enterprises was the RICO enterprise.

In *Turkette*, the Supreme Court held that the existence of an enterprise "is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." [60] In cases in which the government charges that a legal entity is the enterprise, proof that the entity has a legal existence satisfies the enterprise element. This is because, by definition, a legal organization such as a partnership has an ascertainable structure, operates as a continuing unit, and has a purpose common to its members and employees.

The government's proof demonstrated that Cauble Enterprises is a limited partnership organized under the laws of Texas. It proved that the partnership has a formal organization and has operated continuously since 1972 for the purpose of seeking maximum long-term appreciation of the partners' capital. It demonstrated that Cauble Enterprises is an entity different from both the person, Rex C. Cauble, and the pattern of racketeering activity it sought to punish. Having shown that this entity existed, the government met the burden of proving the enterprise element.[61]

---

**60.** 452 U.S. at 583, 101 S.Ct. at 2528, 69 L.Ed.2d at 254. Whether the government must prove the enterprise element with proof different from that used to demonstrate the pattern of racketeering activity seems to be an open question. *See United States v. Cagnina*, 697 F.2d 915, 920–21 (11th Cir.1983). Because in this case the evidence of these two elements did not coalesce, we need not address the question. Nor do we need to decide whether, as the court held in *United States v. Bledsoe*, 674 F.2d 647, 664–65 (8th Cir.), *cert. denied*, —— U.S. ——, 103 S.Ct. 456, 74 L.Ed.2d 608 (1982), it is essential that an enterprise have an ascertainable structure, operate as a continuing unit, and have a goal common to its members. *See Cagnina*, 697 F.2d at 921 (suggesting that this test

conflicts with Fifth Circuit test). Here the enterprise had all of these characteristics.

**61.** *See United States v. Griffin*, 660 F.2d 996, 999 (4th Cir.1981), *cert. denied*, 454 U.S. 1156, 102 S.Ct. 1029, 71 L.Ed.2d 313 (1982); *see also Bennett v. Berg*, 685 F.2d 1053, 1060 (8th Cir. 1982) ("Legal entities are garden-variety 'enterprises' which generally pose no problem of separateness from the predicate acts"); *Hartley*, 678 F.2d at 987–90 (corporation as both enterprise and defendant); *cf. United States v. Computer Sciences Corp.*, 689 F.2d 1181, 1190 (4th Cir.1982) (division of corporation may be RICO enterprise but cannot be RICO conspiracy defendant), *cert. denied*, —— U.S. ——, 103 S.Ct. 729, 74 L.Ed.2d 953 (1983).

### 3. "Conducting" the Enterprise's Affairs "Through" A Pattern of Racketeering Activity

Cauble contends that the government's proof demonstrated a nexus between the smuggling activity and the "Cowboy Mafia," rather than Cauble Enterprises. Therefore, he contends, the evidence was insufficient to prove that he "conducted" Cauble Enterprises' affairs "through" acts of racketeering.

Because we have concluded that a reasonable jury might have believed that Cauble aided and abetted the commission of the charged racketeering acts, we inquire whether his position in Cauble Enterprises facilitated the commission of the acts and whether the acts affected Cauble Enterprises. Based on the evidence, a reasonable jury might have concluded that none of the acts of travel would have occurred but for Cauble's ability to dispatch the Cauble Enterprises airplane and to use Cauble Enterprises' assets to pay for commercial flights. Furthermore, a jury might reasonably have concluded that Cauble's position in Cauble Enterprises made it possible for him to make available the funds for loans, the ranches, and the other assets of the enterprise that the smugglers used. Therefore, the government's proof was sufficient to satisfy the requirement that the defendant's position in the enterprise facilitated the commission of the racketeering acts.

Finally, there is the question whether the racketeering acts affected the enterprise. In this case a reasonable juror might have concluded that the racketeering acts led directly to the successful smuggling ventures, which, in turn, led to the large cash deposits to Cauble Enterprises' account at Western State Bank. This is a sufficient effect to satisfy the test. We, therefore, conclude that the government successfully shouldered its burden of proving that Cauble conducted or participated in the conduct of the enterprise's affairs through a pattern of racketeering activity.[62]

### 4. The Conspiracy Count

Cauble was charged with conspiracy to conduct and participate in the conduct of Cauble Enterprises' affairs through a pattern of racketeering activity. He contends that his conviction under § 1962(d) must be reversed because the government failed to prove that he "agreed to join an enterprise by means of committing two predicate acts."

Our decisions establish that a § 1962(d) conviction requires proof of the enterprise and racketeering elements plus the defendant's objective manifestation of intent to participate, either directly or indirectly, in the affairs of the enterprise.[63] As we stated in *Phillips,* in order to prove a RICO conspiracy the government must prove "the additional element of agreement." 664 F.2d at 1012.[64]

A reasonable jury might have concluded that Cauble agreed to conduct Cauble Enterprises' affairs through a pattern of racketeering activity. It might have believed the direct testimony of Hawkins and Washington that Cauble was involved in

---

**62.** This disposes of Cauble's challenge to his conviction under § 1962(c). This case is simply not like *United States v. Nerone,* 563 F.2d 836 (7th Cir.1977), *cert. denied,* 435 U.S. 951, 98 S.Ct. 1577, 55 L.Ed.2d 801 (1978), which Cauble relies on. In *Nerone* the court held that the government failed to prove the nexus between a legitimate corporation and gambling activity conducted on premises owned by the corporation. It stated: "[The government] made no attempt to show that the proceeds of the casino operation were invested in [the corporation]. Nor did it endeavor to show that gambling revenues were used by or in any way channelled into the corporation or that persons were paid out of gambling revenues to perform services for [the corporation]." 563 F.2d at 851. In this case a jury might have concluded that proceeds of smuggling were deposited to Cauble Enterprises' bank account and used in conducting the partnership's day-to-day affairs.

**63.** *United States v. Elliott,* 571 F.2d 880, 903 (5th Cir.), *cert. denied,* 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978); *see Kopituk,* 690 F.2d at 1323.

**64.** The agreement involved must include the vital element of agreeing to commit the predicate acts of racketeering. *Martino,* 648 F.2d at 383.

the smuggling and, therefore, concluded that Cauble agreed to commit or aid and abet the smuggling predicates.[65] It might have believed the circumstantial evidence that Cauble used Cauble Enterprises' assets to loan money to the smugglers and to finance their travel and, therefore, that Cauble agreed to commit or aid and abet the acts of travel. It might also have believed the circumstantial evidence that Cauble was aware that other assets were being used to arrange marijuana smuggling deals, to provide a haven for the smugglers, and to store and distribute marijuana. The evidence is sufficient to support Cauble's conviction on the conspiracy count.

### 5. The Investment Count

Cauble next contends that the evidence was insufficient to convict on the § 1962(a) count. He contends that the government failed to prove that he gained "income" from a pattern of racketeering activity. He also maintains that the government failed to prove that particular funds invested in the enterprise were derived from a particular unlawful transaction in which he was culpably involved.

Cauble argues that he derived no income because money advanced or loaned to the smugglers and later repaid was not "income." We need not decide the validity of this contention [66] because a reasonable juror might have concluded that Cauble received "income" based on the substantial cash deposits to Cauble Enterprises' special account during 1977 and 1978.

Cauble also argues that the government must do more to support a § 1962(a) conviction than prove that the income was derived from a pattern of racketeering activity. He contends that RICO's legislative history demonstrates that Congress intended to require the government to "trace" illicitly-derived funds from a particular unlawful act to the enterprise.

Cauble relies on the Justice Department's observation on a related bill that "tracing of funds known to be derived from racketeering activities to their eventual investment in a business enterprise [is required] in establishing a violation of subsection (a) of Section 1962." [67] He also relies on a law review article by one of RICO's primary sponsors stating "only one of the three prohibitions in Title IX requires tracing of funds." [68]

■ We do not impart to the word "tracing" as used in these statements the same precision as does Cauble. If the prosecution had demonstrated that Cauble made substantial, unexplained cash deposits into his personal account but not that the money was ever used in any way related to Cauble Enterprises, it would have failed to meet its burden of "tracing." [69] But the prosecution need prove only that illegally derived funds flowed into the enterprise; [70] it need not follow a trail of specific dollars from a particular criminal act.

■ The government presented evidence of large cash deposits to Cauble Enterprises' account and of marijuana smuggling in which Cauble and Cauble Enter-

65. There was contradictory testimony on this point from Cauble and from James Holland. The decision which witnesses to believe was, however, for the jury. See Elliott, 571 F.2d at 884.

66. The Supreme Court has agreed to consider our broad construction of the word "interest" in the RICO forfeiture provision, 18 U.S.C. § 1963(a)(1) (1976). United States v. Martino, 681 F.2d 952 (5th Cir.1982) (en banc), cert. granted sub nom. Russello v. United States, —— U.S. ——, 103 S.Ct. 721, 74 L.Ed.2d 948 (1983).

67. Measures Relating to Organized Crime, 1969: Hearings Before the Subcomm. on Crimi-

nal Laws and Procedure of the Senate Judiciary Comm., 91st Cong., 1st Sess. 387–88 (1969).

68. McClellan, The Organized Crime Act (S. 30) or its Critics: Which Threatens Civil Liberties?, 46 Notre Dame Law. 55, 145 (1970). See 116 Cong.Rec. 18,941 (1970) (same; giving as example "FBI['s] trac[ing] money skimmed from Las Vegas casinos into Swiss bank accounts").

69. Cf. United States v. McNary, 620 F.2d 621 (7th Cir.1980) (statute does not require showing of direct employment of illicit income).

70. See, e.g., Nerone, 563 F.2d at 851, quoted in supra note 62.

prises' employees played a role. The jury might reasonably have inferred that there was a sufficient nexus between the money and the enterprise to satisfy the "investment" requirement of § 1962(a).[71]

### E. Jury Instructions

 Cauble challenges several of the court's instructions to the jury. Because his lawyers lodged no objection to the charge below, we review each of the allegedly defective instructions only for plain error.[72] This means that we will not reverse unless the instruction is so clearly wrong that our failure to notice it would result in a miscarriage of justice or would seriously affect the integrity or public reputation of the judicial proceeding.[73]

 Cauble first claims that the trial judge erred in charging the jury on the enterprise element. He contends that the judge's instructions failed to make clear that the government was required to prove beyond a reasonable doubt that Cauble Enterprises was the RICO enterprise whose affairs were conducted through a pattern of racketeering activity. This instruction,

Cauble claims, amounted to a directed verdict of guilt on the enterprise element.[74]

The trial judge defined "enterprise" by reading the statutory definition to the jury.[75] He then stated:

The "enterprise" charged in this case in Counts 1, 2 and 3 is Cauble Enterprises. Cauble Enterprises is a limited partnership formed pursuant to the laws of Texas with Rex C. Cauble as the sole general partner. Under the Texas Uniform Limited Partnership Act, as the general partner, Rex C. Cauble has the right to control and manage the affairs of Cauble Enterprises and is liable for all debts and obligations of Cauble Enterprises.

 The judge then instructed the jury on the three substantive RICO counts. He prefaced his charge on each count with the admonition that "the Government must prove each of the following essential elements beyond a reasonable doubt." Each charge included the enterprise element and in no charge did the judge tell the jurors that Cauble Enterprises was the RICO enterprise.[76]

---

**71.** See United States v. Parness, 503 F.2d 430, 436 (2d Cir.1974) (given the nature of the enterprise involved, the government's inability to trace the proceeds of particular unlawful debt collections to the enterprise the defendant acquired was "not surprising"), cert. denied, 419 U.S. 1105, 95 S.Ct. 775, 42 L.Ed.2d 801 (1975).

**72.** Fed.R.Crim.P. 30, 52(a).

**73.** United States v. Graves, 669 F.2d 964, 971 (5th Cir.1982); United States v. Thevis, 665 F.2d 616, 645 (5th Cir.) (RICO case), cert. denied, ____ U.S. ____, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982). Patently not all prejudicial errors amount to plain error. See United States v. Herzog, 632 F.2d 469, 472 (5th Cir.1980); 6 L. Orfield, supra note 28, at 448.

**74.** A directed verdict of guilt is always plain error. United States v. Musgrave, 444 F.2d 755, 762 (5th Cir.1971).

**75.** See supra note 13 & accompanying text.

**76.** The relevant portion of the § 1962(a) charge stated:

Fourth: That the Defendant used or invested, directly or indirectly, any part of such income, in acquisition of any interest in, or the establishment or operation of the enterprise.

Fifth: That the enterprise engaged in, or its activities affected interstate or foreign commerce. (emphasis added).

The § 1962(c) charge stated in pertinent part:

Fourth: That through the commission of two or more connected offenses the Defendant conducted or participated in the conduct of the enterprise.

Fifth: That the enterprise engaged in, or that its activities affected interstate or foreign commerce. (emphasis added).

The § 1962(d) charge stated:

First: That a conspiracy to conduct or participate directly or indirectly in the conduct of the affairs of an enterprise engaged in or affecting foreign or interstate commerce through a pattern of racketeering activity, consisting of the commission of two or more acts or racketeering activity, was willfully formed by two or more persons and was existing at the time alleged in the indictment. Second: That the Defendant, with knowledge of the conspiracy, willfully became a member of the conspiracy by agreeing to participate directly or indirectly in the conduct of the affairs of the enterprise.... (emphasis added).

In short, the judge's instructions adequately conveyed to the jury the requirement that they conclude beyond a reasonable doubt that Cauble Enterprises was the RICO enterprise. The judge told the jurors that the enterprise *charged* was Cauble Enterprises; he never told them that the RICO enterprise *was* Cauble Enterprises. The directive left the jury free to conclude that the government failed to prove that Cauble Enterprises was the RICO enterprise. Accordingly, it was not plainly erroneous.

Cauble nevertheless argues that the trial judge's instruction on Count Three was wrong because it impermissibly combined the RICO enterprise and Cauble Enterprises.[77] But this part of the instruction was merely a summary of the indictment and not a direction to the jury. As our previous discussion of the charge demonstrates, the trial judge made a distinction between Cauble Enterprises and the RICO enterprise in instructing the jury about the elements of the offense. There was no plain error here.

▇▇▇ Cauble next faults the district judge's failure to define the word "income" in the § 1962(a) count instructions. He argues that the failure was particularly prejudicial because "fund sources were a critical issue at trial."

This ingenious transition from *sources* of income to *existence* of income points up the weakness of Cauble's argument. The defense did not dispute at trial and does not dispute now that Cauble Enterprises' Special Account received substantial deposits of cash. It disputed whether the funds came from drug smuggling or cattle sales. The judge's failure to define this word of common usage and meaning did not fall to the level of plain error.[78]

Cauble next challenges the trial judge's charge on the RICO predicates. He suggests that the judge's instruction that the jury could consider "any act" in violation of the Travel Act as an instance of racketeering activity impermissibly amended the indictment by allowing the jury to consider the Travel Act violations alleged in Counts Four, Nine, and Ten as RICO predicates even though they were not charged as such.[79]

▇▇▇ The trial judge should have made it clear to the jurors that only the predicate acts alleged in the RICO counts could support a RICO conviction.[80] His failure to do so was not plain error, however, in view of his instruction to the jury that: "A separate crime or offense is charged against the Defendant in each count of the Indictment. Each offense and the evidence pertaining to it should be considered separately." We find no miscarriage of justice in the trial judge's failure to make explicit what was implicit.[81]

---

**77.** The judge stated that the indictment charged that:

> Rex C. Cauble, individually and doing business as Cauble Enterprises, was employed by and was associated with *an "enterprise"* as defined by Title 18, United States Code, Section 1961(4). It is further alleged that the Defendant did unlawfully, knowingly and willfully conduct and participate, directly and indirectly, in the conduct of the affairs of *Cauble Enterprises,* through a pattern of racketeering activity. Count 3 further charges that *the alleged enterprise* did engage in and its activities did affect interstate and foreign commerce. (emphasis added).

**78.** *United States v. Anderton,* 629 F.2d 1044, 1049 (5th Cir.1980); *United States v. Crockett,* 506 F.2d 759, 762 (5th Cir.), *cert. denied,* 423 U.S. 824, 96 S.Ct. 37, 46 L.Ed.2d 40 (1975).

**79.** The instruction read:

> An act in violation of either of these statutes [18 U.S.C. § 1952 or 21 U.S.C. § 952] on one occasion would constitute "an act of racketeering activity" separate and apart from a later act in violation of the same statute.

**80.** Contrary to the government's suggestion, merely drawing the jury's attention to the predicate offenses alleged during a summary of the indictment does not suffice to limit the jury's consideration on the RICO counts to the predicates. Nor does the district judge's instruction that "[i]n considering racketeering acts . . . you are limited to those acts charged in the *Indictment. . . .*" (emphasis added).

**81.** Our task in evaluating jury instructions is to assess the instructions in the light of the entire trial to determine whether the charge adequately presented the issues to the jury. *Graves,* 669 F.2d at 970. Reversible error—much less plain error—does not occur so long as the charge

■ Cauble finally assaults the judge's failure to instruct the jury that its verdict on the RICO predicates had to be unanimous. The judge stated that the government had to prove two acts of racketeering activity beyond a reasonable doubt, that it had to prove every essential element of each count beyond a reasonable doubt, and that the jury's verdict had to be unanimous.[82] It might have been better practice to reinforce this by telling the jury that the jurors must be unanimous on each predicate, but had trial counsel made such a request the trial judge would have been able to consider it and likely would have granted it. When counsel sits idly by, the trial judge is not given the opportunity to reassess the charge. In the absence of objection, it was not necessary for the judge to elaborate this phase of the charge because he gave an express instruction that each juror had to agree to the verdict. No miscarriage of justice resulted from this omission.[83]

## II. The RICO Forfeiture

### A. *Background*

American antipathy for the English common law's "forfeiture of estate," which disinherited those unfortunate enough to be kin to felons, dates from the founding of the nation.[84] Criminal forfeiture has, therefore, been largely unknown in the United States.[85]

Congress added the forfeiture provisions[86] to RICO in order to attack the

---

viewed as a whole accurately frames the legal questions. *See United States v. Taylor,* 680 F.2d 378 (5th Cir.1982).

**82.** The judge also told the jury, in instructing on the Travel Act violations charged in Counts Four, Nine, and Ten that if it found beyond a reasonable doubt that "one method or mode of violating the law occurred, that is sufficient [to convict] *so long as you agree unanimously* on the particular mode or method involved." (emphasis added).

**83.** *See United States v. Raffone,* 693 F.2d 1343, 1347–48 (11th Cir.1982) (no plain error in failing to instruct jury that it had to agree unanimously on identity of conspirators); *id.* at 1350 (Anderson, J., concurring) (charge read as a whole fairly instructed jury it must be unanimous).

**84.** 18 U.S.C. § 3563 (1976) states: "No conviction or judgment shall work corruption of blood or any forfeiture of estate." This provision was enacted as the Act of Apr. 30, 1790, ch. 9, § 24, 1 Stat. 117. *See also* U.S. Const. art. III, § 3, cl. 2. Forfeiture of estate meant that all of the convicted felon's chattels and goods went to the government and all of his land to his lord. *See* Weiner, *Crime Must Not Pay: RICO Forfeiture in Perspective,* 1 N.Ill.U.L.Rev. 225, 229–30 (1981).

**85.** The lifetime estates of Confederate sympathizers were, however, forfeited during the Civil War. *See Miller v. United States,* 78 U.S. 268, 20 L.Ed. 135 (1870); *Bigelow v. Forrest,* 76 U.S. 339, 19 L.Ed. 696 (1869).

**86.** (a) Whoever violates any provision of section 1962 of this chapter shall be fined not more than $25,000 or imprisoned not more than twenty years, or both, and shall forfeit to the United States (1) any interest he has acquired or maintained in violation of section 1962, and (2) any interest in, security of, claim against, or property or contractual right of any kind affording a source of influence over, any enterprise which he has established, operated, controlled, conducted, or participated in the conduct of, in violation of section 1962.

. . . .

(c) Upon conviction of a person under this section, the court shall authorize the Attorney General to seize all property or other interest declared forfeited under this section upon such terms and conditions as the court shall deem proper. If a property right or other interest is not exercisable or transferable for value by the United States, it shall expire, and shall not revert to the convicted person. All provisions of law relating to the disposition of property, or the proceeds from the sale thereof, or the remission or mitigation of forfeitures for violation of the customs laws, and the compromise of claims and the award of compensation to informers in respect of such forfeitures shall apply to forfeitures incurred, or alleged to have been incurred, under the provisions of this section, insofar as applicable and not inconsistent with the provisions hereof. Such duties as are imposed upon the collector of customs or any other person with respect to the disposition of property under the customs laws shall be performed under this chapter by the Attorney General. The United States shall dispose of all such property as soon as commercially feasible, making due provision for the rights of innocent persons.

18 U.S.C. § 1963 (1976).

sources of economic power of organized crime [87] in addition to removing from power and imprisoning those individuals who violate the statute. It viewed the sanctions and remedies against organized crime then available to the government as "unnecessarily limited in scope and impact." [88] As enacted the forfeiture provisions are meant to reach "the illgotten gains of criminals where they enter or operate an organization through a pattern of racketeering activity." [89]

### B. *Claims of Error*

After finding Cauble guilty on the RICO counts, the jury responded to special interrogatories regarding the forfeiture of his interest in Cauble Enterprises.[90] Cauble now launches a barrage of attacks against the validity of the forfeiture.

#### 1. Due Process

 . Cauble first contends that the forfeiture violates the due process clause because it affects property rights of the limited partners of Cauble Enterprises, neither of whom were given notice of the forfeiture and an opportunity to be heard. He claims that the government may not partition the undivided partnership interest and remove the general partner without a finding against all owners that partnership property was used or acquired in violation of law.[91]

Neither of the limited partners has sought to be heard in this case. Their remedy, as we made explicit in *United States v. L'Hoste,* 609 F.2d 796 (5th Cir.), *cert. denied,* 449 U.S. 833, 101 S.Ct. 104, 66 L.Ed.2d 39 (1980), is to petition the Attorney General for remission or mitigation of the forfeiture. As we stated in that case, "Congress plainly addressed the possible hardship that forfeiture could cause to those innocent parties holding an interest in forfeited property and gave responsibility to the United States, not the district court, to alleviate the hardship." 609 F.2d at 812.[92] This directive applies with equal force to the court of appeals.

Cauble asks that we distinguish *L'Hoste* on the grounds that it involved freely transferable corporate shares rather than undivided partnership interests and that it involved inchoate rather than vested property rights. These distinctions lack substance.

---

**87.** *See* S.Rep. No. 617, 91st Cong., 1st Sess. 79 (1969).

**88.** Statement of Findings and Purpose to Title IX, *reprinted at* 18 U.S.C. following § 1961 (1976); S.Rep. No. 617, 91st Cong., 1st Sess. 78–79 (1969).

**89.** 116 Cong.Rec. 592 (1970) (remarks of Sen. McClellan). *See also* Comment, *RICO Forfeitures and the Rights of Innocent Third Parties,* 18 Cal.W.L.Rev. 345, 345 (1982) ("divorce the convicted defendant's corrupting influence from the corrupted enterprise") [hereinafter cited as *Rights of Innocent Parties*].

**90.** The interrogatories and the jury's answers to them read:
Interrogatory No. 1
Do you find from [sic] a reasonable doubt that Rex C. Cauble's interest in Cauble Enterprises was maintained in violation of 18 U.S.C., Section 1962?
Answer: We do.
Interrogatory No. 2
Do you find beyond a reasonable doubt that Rex C. Cauble's interest in Cauble Enterprises afforded a source of influence over the enterprise which he has operated, controlled,

conducted or participated in the conduct of, in violation of Title 18, Section 1962?
Answer: We do.
Interrogatory No. 3
It is undisputed that Rex C. Cauble owns approximately one-third of the Limited Partnership known as Cauble Enterprises.
Do you find beyond a reasonable doubt that the Defendant, Rex C. Cauble, has made his interest in Cauble Enterprises, together with all of his contractual rights and offices therein, subject to forfeiture as a result of conviction of one or more of the offenses charged in Counts 1, 2 and 3 of the Indictment?
Answer: We do.

**91.** The government claims that Cauble lacks standing to raise this issue. In view of our disposition of this claim we do not consider that argument.

**92.** *See Rights of Innocent Parties, supra* note 89, at 355–58; *see also United States v. Mandel,* 505 F.Supp. 189 (D.Md.1981).
Judges Rubin and Tate adhere to the position stated in Judge Tate's dissent from the denial of rehearing en banc in *L'Hoste.* 615 F.2d 383 (5th Cir.) (Tate, J., dissenting), *cert. denied,* 449 U.S. 833, 101 S.Ct. 104, 66 L.Ed.2d 39 (1980).

The former would permit a defendant to avoid RICO forfeiture by forming a partnership, but not a corporation, with an innocent party; the latter would make the validity of federal RICO forfeitures subject to the nuances of state property law. Therefore, *L'Hoste* squarely controls this claim of error.

### 2. Conflict of Interest

Cauble next contends that, because Cauble Enterprises' property interests were affected by the trial and consequent forfeiture, it was entitled to separate representation. He claims that trial counsel made an insufficient effort to demonstrate that there was no connection between the drug-smuggling conspiracy and Cauble Enterprises because he was more concerned with proving Cauble's lack-of-knowledge defense.

██ If Cauble Enterprises had been charged as a RICO defendant instead of or in addition to being charged as the enterprise, it would have been entitled to separate counsel.[93] But Cauble Enterprises was charged with no crime and suffers no punishment as a result of Cauble's conviction.

The forfeiture in this case is of Rex C. Cauble's property interest in Cauble Enterprises. It is *in personam,* imposed directly on a guilty person, rather than *in rem,* imposed on "guilty" property. Therefore, Cauble Enterprises had no stake in the proceeding and was not entitled to separate counsel.

### 3. Defects in the Indictment

██ Cauble next claims that the notice of forfeiture failed to advise him of the nature, cause, and extent of the forfeiture sought. These claims focus on the allegedly confusing character of the notice, were not presented to the district court, and do not assert that the indictment failed to charge an offense. Therefore, they are waived.[94] Even if not waived, however, these claims would not support a reversal. The purpose of the notice of forfeiture in the indictment is to inform the defendant that the government seeks forfeiture as a remedy.[95] Barebones pleading suffices so long as it puts the defendant on notice that the government seeks forfeiture and identifies the assets subject to forfeiture with sufficient specificity to permit the defendant to marshal evidence in their defense.[96] This the indictment did by noticing that the government sought to forfeit "the interests [sic] of Rex C. Cauble in Cauble Enterprises" and by listing thirteen assets included in Cauble Enterprises' holdings.

### 4. Jury Instructions and Special Verdict

Cauble challenges the judge's charge to the jury and the adequacy of the special verdict form the jury completed in ordering the forfeiture. He claims that the instructions failed to inform the jury of its role in determining the scope of the defendant's interest in the enterprise, in effect directing a verdict on the extent of the forfeiture.

The judge explained the forfeiture allegation in the indictment to the jury, stated that the government sought to forfeit only Cauble's one-third interest in Cauble Enterprises, and re-summarized the allegations of all three RICO counts. He then read the forfeiture provision, § 1963(a), to the jury and added: "[I]f you find beyond a reasonable doubt that the Defendant is guilty of

---

93. *See, e.g., Thevis,* 665 F.2d at 644–46; *cf. Wood v. Georgia,* 450 U.S. 261, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981) (conflict possible when employer's lawyer represented employees).

94. *See Lerma,* 657 F.2d at 789–90 (and cases cited therein).

95. *See* Fed.R.Crim.P. 7(c)(2).

96. *United States v. Boffa,* 688 F.2d 919, 939 (3d Cir.1982) ("by alleging that all of the appellants' interest in the enumerated corporations was subject to forfeiture, the indictment alleged the 'extent of the interest or property subject to forfeiture'" required by Rule 7(c)(2)), *cert. denied,* —— U.S. ——, 103 S.Ct. 1272, 75 L.Ed.2d 494 (1983); *United States v. Grammatikos,* 633 F.2d 1013, 1024 (2d Cir. 1980) (same); *see United States v. Peacock,* 654 F.2d 339, 351 (5th Cir.1981), *modified,* 686 F.2d 356 (5th Cir.1982) (per curiam), *petition for cert. filed,* 51 U.S.L.W. 3512 (U.S. Nov. 23, 1982) (No. 82–1069).

any of the offenses charged in Counts 1, 2 or 3 of the Indictment, it will be your duty to determine whether the government has proven beyond a reasonable doubt that Rex C. Cauble's interest in Cauble Enterprises is subject to forfeiture to the United States." The judge also gave the jury the special forfeiture verdict.[97]

Before considering Cauble's claims of error, we pause to explain briefly how some of the complaints he raises can be avoided in future RICO trials. The substantive jury charge in these trials is ordinarily extremely long[98] and requires the jurors to pay close attention to a number of definitions and elements. Therefore, it is not surprising that the instructions on forfeiture, which ordinarily come at the end of the substantive charge, are often brief—perhaps excessively so.

■ To ease the jurors' task in determining guilt or innocence, the forfeiture issue should be withheld from them until after they have returned a general verdict. At that time the trial judge can instruct the jurors fully about forfeiture and submit the special verdict to them. Such a bifurcated trial—using, of course, only one jury—is not only convenient for the judge and fairer to the defendant. It also prevents the potential penalty of forfeiture from influencing the jurors' deliberations about guilt or innocence.

That practice was not followed here, but Cauble made no objection to the judge's method, instructions, or special verdict form. We, therefore, review only for plain error.

■ Cauble argues that the instructions failed to inform the jury that only interests "acquired or maintained" in violation of § 1962 or "affording a source of influence over the enterprise" are subject to forfeiture. He claims that the instructions and verdict form made it appear that a RICO conviction carried a penalty of automatic forfeiture of his entire interest in Cauble Enterprises. This claim is belied, however, by the fact that the judge read § 1963(a) to the jury and, therefore, used the precise words Cauble emphasizes in defining the interest subject to forfeiture. Furthermore, the special verdict specifically asked the jury whether Cauble's interest in Cauble Enterprises afforded him a source of influence over the enterprise. Although the judge might have expanded the entire forfeiture charge and emphasized this point in his instructions, the charge he gave, read together with the special verdict form, accurately presented the relevant legal issue to the jury.

■ Cauble next argues that the jury was not informed that it had to find a nexus between the racketeering activity and the property claimed. We agree that proper jury instructions should "include language that suggests that a jury *may* find an interest or contractual right forfeitable if there is evidence linking the defendant's conduct to the property interest and the government has proved such a nexus beyond a reasonable doubt."[99] Nevertheless, the omission of this charge did not amount to plain error. The substantive RICO instructions required the government to prove that Cauble conducted the enterprise's affairs through a pattern of racketeering activity. Therefore, the jury had already found beyond a reasonable doubt a link between Cauble's conduct, the enterprise, and the racketeering activity.

Furthermore, the second question in the special verdict form required the jury again to find beyond a reasonable doubt that Cauble "conducted" the enterprise through a pattern of racketeering activity. The jury answered the question affirmatively and, therefore, found the nexus required. The omission of the nexus instruction from the forfeiture charge was not plain error.

---

**97.** *See supra* note 90. The special verdict was essentially identical to the one we approved in *L'Hoste,* 609 F.2d at 813.

**98.** The charge in this case was the longest the trial judge had ever given. It took him approx- imately one and one-half hours to deliver and covers 55 pages in the trial transcript.

**99.** Weiner, *supra* note 84, at 252 n. 105 (empha- sis in original).

Cauble next claims that the charge made it impossible for the jurors to render anything but a blanket verdict of forfeiture because they were not furnished a list of Cauble Enterprises' assets so that they might forfeit only those that were the basis for Cauble's control and were not asked to determine what "manner of forfeiture" would deprive him of his influence over the enterprise.[100] Cauble emphasizes the minor role of some of Cauble Enterprises' assets and the absence of evidence that some assets were involved at all. This argument, however, is based on an incorrect view of the operation of RICO's forfeiture provisions.

■ The RICO forfeiture is *in personam:* a punishment imposed on a guilty defendant. It deprives that defendant of all of the assets that allow him to maintain an interest in a RICO enterprise, regardless whether those assets are themselves "tainted" by use in connection with the racketeering activity. Thus, in *United States v. Hess,* 691 F.2d 188, 190–91 (4th Cir.1982), the court held that the jury may not find that less than the full amount of the defendant's interest in an enterprise is subject to forfeiture because § 1963 is mandatory. The court concluded that the only issues for the jury are whether the defendant violated RICO and what interest the defendant held in the enterprise.[101]

In *United States v. Huber,* 603 F.2d 387, 396 (2d Cir.1979), *cert. denied,* 445 U.S. 927,

100 S.Ct. 1312, 63 L.Ed.2d 758 (1980), the jury was "required to specify which corporations were part of the enterprise and the percentage of [the defendant's] interest in each." The indictment in that case, however, charged an enterprise-in-fact composed of a number of corporations. Therefore, it was necessary for the jury to decide which corporations were, in fact, part of the enterprise.[102]

■ In this case, however, the enterprise charged was a single pre-existing legal entity. Once Cauble was convicted his interest in that entity was subject to forfeiture in accordance with § 1963(a). The jury was not required to select only certain of that entity's assets for forfeiture, just as the jury in *Huber* was not required to determine which assets or divisions of the several corporations were subject to forfeiture.[103]

### 5. Sufficiency of the Evidence

Cauble's challenge to the sufficiency of the evidence supporting forfeiture reargues his claim that there is no culpable connection between Cauble's conduct and the forfeited property. For the reasons stated in our discussion of the sufficiency of the evidence to support the substantive RICO convictions, we conclude that a reasonable juror might have been persuaded of such a nexus beyond a reasonable doubt.

Cauble further argues that, even if the evidence supports a connection between

---

**100.** The government correctly points out that Cauble's claim that Cauble Enterprises does not own some of the assets listed in the Notice of Holdings Subject to Forfeiture is made for the first time in this court. At trial Cauble's attorney asked him: "Every asset that you have, and that [your wife] has, and that [your son] has, is an asset of Cauble Enterprises?" Cauble replied: "Yes, sir." He testified that Cauble Enterprises even owned the suit he was wearing.

**101.** Here that Cauble owned approximately a one-third share of Cauble Enterprises was undisputed.

**102.** Indeed, the *Huber* court expressly stated: "*Given the nature of the enterprise alleged,* it was obviously necessary for the jury to say which entities were part of it ... in order to

determine the 'extent of the ... property subject to forfeiture.'" 603 F.2d at 396 (emphasis added).

**103.** In *Grammatikos,* the government sought to forfeit fourteen pieces of property. The judge submitted a list of nine items to the jury, which forfeited two under the provisions of 21 U.S.C. § 848(a)(2) (1976). 633 F.2d at 1024. By contrast in this case the government sought forfeiture of only one "piece" of property: Cauble's share of Cauble Enterprises. The jury was asked whether that "item" was subject to forfeiture and concluded that it was. *See United States v. Tunnell,* 667 F.2d 1182, 1188 (5th Cir.1982) (jury not required to determine what part of motel used in prostitution enterprise and what part used legally).

bank accounts, assets, and entities, this proof does not justify forfeiture of Cauble's entire undivided interest in Cauble Enterprises. We reiterate that property forfeited under RICO need not be "guilty." RICO forfeiture is aimed at divorcing guilty persons from the enterprises they have corrupted. A reasonable juror might have been persuaded that this task would be accomplished by forfeiting Cauble's share of Cauble Enterprises.

### 6. Character of Cauble's Interest

■ Cauble finally argues that, because his general partnership interest in Cauble Enterprises is "not exercisable or transferable for value by the United States," [104] it is subject only to expiration and not to forfeiture. He argues that a forfeiture order installing the United States as general partner of Cauble Enterprises is impermissible under both the partnership articles and Texas law.

The language in § 1962(c) on which Cauble relies has been construed only once.[105] In that case we noted that the defendant's offices in various unions and employee benefit plans could not meaningfully be transferred to the United States and were, therefore, subject only to termination.[106]

Every court that has considered the broader question what "interests" are subject to forfeiture has concluded that

§ 1963(a) requires forfeiture of interests in the nature of ownership of or control over an enterprise.[107] Cauble's general partnership interest in Cauble Enterprises is a source both of ownership and control. This interest is a property interest, valuable and heritable. It is not merely a "position." [108]

The forfeiture provision of RICO is designed to prevent a convicted defendant from being replaced by the enterprise or from exercising control over the enterprise's affairs *in absentia.*[109] In *McNary,* the court upheld forfeiture of the defendant's partnership interest in a family-owned travel service. 620 F.2d at 622, 628–29. In *L'Hoste,* we upheld forfeiture of a stockholder's interest in a corporation. 609 F.2d at 809, 812.[110] There is no reason to make the effect of a forfeiture depend on the form of the enterprise's organization. Accordingly, we hold that Cauble's general partnership interest in Cauble Enterprises is forfeitable to the United States.

### III. The Travel Act Counts

Counts Four, Nine, and Ten charge Cauble with aiding and abetting or causing acts of travel in violation of § 1952. Count Four alleges as a violation Foster's flight from Denton to Thomasville on March 3, 1977. Count Nine alleges the Foster-Gerdes flight from Las Vegas to Denton on July 26, 1977. Count Ten alleges a flight

---

**104.** 18 U.S.C. § 1963(c) (1976).

**105.** *United States v. Rubin,* 559 F.2d 975 (5th Cir.1977), *vacated,* 439 U.S. 810, 99 S.Ct. 67, 58 L.Ed.2d 102 (1978), *aff'd in relevant part,* 591 F.2d 278 (5th Cir.), *cert. denied,* 444 U.S. 864, 100 S.Ct. 133, 62 L.Ed.2d 87 (1979).

**106.** 559 F.2d at 992 & n. 18.

**107.** *See Martino,* 681 F.2d at 957 n. 18 (interests such as stock holdings or real property ownership and interests affording influence on or control over enterprise); *United States v. Thevis,* 474 F.Supp. 134, 143 (N.D.Ga.1979) (assuming forfeitability of "capital interest in a partnership"), *aff'd,* 665 F.2d 616 (5th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982). *See generally* Annot., 61 A.L.R.Fed. 879 (1983).

**108.** In *Rubin,* we stated that Congress' goal of eradicating the economic base of organized criminal activity translated readily into elimina-

ting "ownership interests" and "self-perpetuating economic power." 559 F.2d at 992.

**109.** *See* 116 Cong.Rec. 591 (1970) (remarks of Sen. McClellan) ("experience has shown that it is insufficient to merely remove and imprison individual mob members"); *id.* at 607 (remarks of Sen. Byrd) (legislation removes leaders of organized crime from positions of ownership, prevents them and their associates from regaining control, and visits heavy economic sanctions).

**110.** *See also, e.g., Huber,* 603 F.2d at 396 (shares of various corporations). The only commentator who has discussed this point states: "[A] continuing proprietary right in the nature of a partnership or stock ownership . . . would obviously be subject to forfeiture under section 1963(a)(2)." Weiner, *supra* note 84, at 245 (footnote omitted).

from Denton to Bogata, Colombia on December 12, 1976.

Cauble claims that Count Four is multiplicitous of the RICO predicate charging a Travel Act violation based on Foster's return flight from Thomasville to Denton. This contention is arguably waived for the reasons we have discussed above.[111]

The contention, if not waived, is meritless. First, each act of interstate travel constitutes a separately punishable offense.[112] Second, even if this indictment in fact charged the same trip as a RICO predicate and a substantive offense, an indictment charging RICO predicates as separate offenses is not multiplicitous.[113]

Cauble next contends that the indictment failed to charge an offense because it did not allege the conduct or omission constituting the violation of the law. The essential elements of a Travel Act violation are travel in interstate commerce, specific intent to promote, manage, establish, or carry on "unlawful activity," or to distribute the proceeds of unlawful activity, and knowing and willful commission of an act in furtherance of that intent subsequent to the act of travel. Because the statute fully and unambiguously sets out the essential elements of the offense, indictments drafted substantially in its language are sufficient.[114]

Cauble finally claims that the evidence is insufficient to support his conviction on these counts. The district judge limited the jury's consideration to aiding and abetting, for the evidence demonstrated that Cauble did not travel on any of these occasions.

Cauble argues that his conviction on Count Four cannot stand because there was no evidence he knew Foster was traveling to distribute marijuana proceeds or was involved in marijuana smuggling in 1977. A reasonable jury might, however, have believed the testimony of William McKesson that Foster told him or implied to him that Cauble knew about the smuggling activities. It could also have believed from the other evidence detailed above[115] that Cauble was associated with and participating in the venture and, by paying for tickets, loaning money, and allowing use of the airplane, was acting to make it succeed. Therefore, the evidence was sufficient to convict on Count Four.

Cauble claims that the evidence was insufficient to convict on Count Nine because he merely furnished the airplane to Foster without knowledge that it would be used for criminal purposes.[116] He suggests that his testimony that he made repeated phone calls inquiring why Foster had not returned proves that he did not know of the activity.

---

111. *See supra* text following note 30.

112. *E.g., United States v. Alsobrook,* 620 F.2d 139, 142 (6th Cir.), *cert. denied,* 449 U.S. 843, 101 S.Ct. 124, 66 L.Ed.2d 51 (1980). Cauble argues in brief that *Alsobrook* stands for the proposition that each round trip under the Travel Act is a separate unit of prosecution. Yet that court stated: "the grand jury could have indicted Alsobrook in separate counts for *each of his trips* to Michigan." 620 F.2d at 142 (emphasis added). This despite the fact that the return trips charged were stricken from the indictment. *Id.* at 142 n. 3.

113. In *Peacock,* we held that double jeopardy is not offended by the imposition of consecutive sentences on a RICO count and a mail fraud count charged both as a separate crime and a RICO predicate. 654 F.2d at 348–49. Implicit in that holding is the conclusion that the counts did not charge the same crime. *See United States v. Boylan,* 620 F.2d 359, 360–61 (2d Cir.),

*cert. denied,* 449 U.S. 833, 101 S.Ct. 103, 66 L.Ed.2d 38 (1980).

114. *See generally United States v. Ramos,* 666 F.2d 469, 474 (11th Cir.1982). For cases holding that the Travel Act sets out the elements of the offense with sufficient clarity to permit indictments framed in the statutory language, see *Spinelli v. United States,* 382 F.2d 871, 888 (8th Cir.1967) (en banc), *rev'd on other grounds,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); *Turf Center, Inc. v. United States,* 325 F.2d 793, 796 (9th Cir.1963).

115. *See supra* notes 35–38 & accompanying text.

116. One cannot be convicted of aiding and abetting without knowledge of the criminal venture. *United States v. Williams,* 569 F.2d 823 (5th Cir.1978).

The jury, however, apparently chose not to believe Cauble's testimony.[117] It instead seems to have believed Pilot Crownover's testimony that Cauble told him to "hang tight" for six days. A reasonable jury might have concluded from the evidence that Cauble knew the purpose of the trip and was guilty as an aider and abettor.

Cauble argues that his conviction on Count Ten must be reversed because Cauble Enterprises' mere payment for a ticket, for which it was later allegedly reimbursed, is insufficient to "cause" an act of travel absent evidence of Cauble's knowledge of or participation in a marijuana smuggling scheme. The evidence supporting this conviction is Hawkins' testimony that Foster told him that he was going to Colombia to set up a gig, Cauble Enterprises' payment for the ticket, and its loan of $3,500 to Foster on December 10, 1976. Cauble claimed that the loan was for a vacation and that the price of the ticket was repaid.[118] Although the question is a close one, we conclude that a reasonable juror might infer from this evidence that Cauble knew the purpose of the trip.

### IV. The Bank Misapplication Counts

Cauble challenges the convictions under § 656 on the ground that the indictment fails to state an offense and the evidence is insufficient to support a conviction. Each count is predicated on a bank loan made to Charles Foster at Cauble's request.

Count Five charges that Cauble willfully misapplied $37,706 of Western State Bank's funds on March 13, 1978. Count Six charges that Cauble willfully misapplied $10,000 of South Main Bank's funds on March 31, 1978. Count Seven charges that Cauble willfully misapplied $50,000 of Western State Bank's funds on May 2, 1978. Count Eight charges that Cauble willfully misapplied $50,000 of South Main Bank's funds on May 30, 1978. Each loan was ultimately repaid in full; Cauble personally guaranteed the $37,000 loan and the $50,000 South Main loan.

Cauble argues that the indictment fails to charge a crime because it does not allege what acts constituted the "willful misapplication" subjecting him to criminal liability. The essential elements of a violation of § 656 are that the accused was a bank officer, the bank was connected in some capacity with a national bank, the accused willfully misapplied bank funds, and the accused acted with intent to injure or defraud the bank.[119] We have long held that an indictment framed in the statutory language charges an offense under § 656 and that the term "willful misapplication" is not so vague as to require supplementation by further averment.[120] This claim of error is, therefore, without merit.

Cauble next claims that the evidence was insufficient to support his convictions. He contends first that consent by the bank to a loan is a defense to the charge of willful misapplication. Therefore, he urges, the board of directors' approval of the loan charged in Count Seven and the loan committee's approval of the loan charged in Count Eight compel reversal of these convictions.

---

117. No calls to Las Vegas appear on Cauble's telephone bill during this period. The Cauble Enterprises log of incoming and outgoing calls was missing. See supra note 46 & accompanying text.

118. Cauble claims in brief that the evidence of reimbursement is "undisputed." The testimony was: "Q: You paid for the ticket for him? A. He paid it back." The jury was not required to believe this "undisputed" evidence.

119. United States v. Welliver, 601 F.2d 203, 207 (5th Cir.1979).

120. United States v. Broome, 628 F.2d 403, 405 (5th Cir.1980) (per curiam); Welliver, 601 F.2d

at 207–08; United States v. Davis, 592 F.2d 1325 (5th Cir.), cert. denied, 442 U.S. 946, 99 S.Ct. 2894, 61 L.Ed.2d 318 (1979); United States v. Mann, 517 F.2d 259, 267 (5th Cir. 1975), cert. denied, 423 U.S. 1087, 96 S.Ct. 878, 47 L.Ed.2d 97 (1976); United States v. Bearden, 423 F.2d 805, 810–11 (5th Cir.), cert. denied, 400 U.S. 836, 91 S.Ct. 73, 27 L.Ed.2d 68 (1970). Other circuits are in accord. See United States v. Duncan, 598 F.2d 839 (4th Cir.), cert. denied, 444 U.S. 871, 100 S.Ct. 148, 62 L.Ed.2d 96 (1979); United States v. Fortunato, 402 F.2d 79 (2d Cir.1968), cert. denied, 394 U.S. 933, 89 S.Ct. 1205, 22 L.Ed.2d 463 (1969).

Although some cases state that the bank's consent to a loan is a complete defense to a willful misapplication charge,[121] it is not clear that consent alone is an absolute bar. Thus, in *Mulloney v. United States,* 79 F.2d 566, 583 (1st Cir.1935), *cert. denied,* 296 U.S. 658, 56 S.Ct. 383, 80 L.Ed. 468 (1936), the court said: "It is, no doubt, true that consent by a bank to a loan would be a defense to the crime of willful misapplication, since there could be no conversion of funds if there was a valid consent by the bank or its board of directors." The court found no valid assent, however, because a disinterested majority of the board had never approved the transaction.

However, in a number of other cases courts have held that knowledge,[122] ratification,[123] and consent [124] are not *per se* defenses to the charge. Instead these are evidentiary matters that may be considered as part of the defense that there was either no willful misapplication or no intent to injure the bank. As the court stated in *United States v. Breese,* 173 F. 402, 410 (C.C.W.D. N.C.1909), *aff'd* 203 F. 824 (4th Cir.1913), "The most formal vote of the board of directors could not authorize the embezzlement, abstraction, or willful misapplication of the funds of the bank." In *Mann,* we rejected the contention that the indictment must allege that the misapplication was without the consent of the bank or its directors. We stated, citing *Mulloney* and *United States v. Klock,* 210 F.2d 217 (2d Cir.1954): "consent is a matter of defense." 517 F.2d at 268. In *United States, v. Riley,* 550 F.2d 233 (5th Cir.1977), the trial court excluded evidence that the bank frequently

allowed other persons to conduct business as the defendant had. We reversed the conviction, reasoning that although "a general practice is not an absolute defense to criminality . . . the wiser . . . approach is to let the jury consider the practice in determining whether [the defendant] intended to injure and defraud the bank." *Id.* at 236. We stated that *Mann* had "implicitly recognized" that the jury should consider whether the bank's consent vitiated the defendant's intent to injure or defraud the bank and added:

> The government's contention that [the defendant] was the chief executive officer of the bank and therefore could not rely on this [authorization] defense is a jury argument, not a legal one. The jury might have rejected this defense as a sham. It might have considered the alleged policy to be [the defendant's] cynical generosity to a few cronies at the expense of others, but that was for the jury to resolve.

In *United States v. Salinas,* 654 F.2d 319 (5th Cir.1981), the defendant contended that a series of loans could not constitute criminal misapplication because they were authorized by the bank's board of directors. We stated:

> [W]hile valid consent by a bank's board of directors may be a defense to a charge of misapplication, no such board can vitiate a fraud on the bank. Thus, if the [defendants] . . . had an intent to defraud, "approval of the board of directors is no longer material to whether there was a misapplication of bank funds." The jury . . . found such an intent; the fact that

---

**121.** Cauble relies on *United States v. Britton,* 108 U.S. 193, 2 S.Ct. 526, 27 L.Ed. 701 (1883) for the proposition that the bank's consent is a defense. That case involved the question whether an indictment failing to allege that the board of directors did not consent charged a crime under the predecessor to § 656. There is language in *Britton* that may be construed as recognizing a consent defense. *See id.* at 197, 2 S.Ct. at 529, 27 L.Ed. at 702; *United States v. Sorensen,* 330 F.Supp. 642, 645–46 (D.Mont. 1971).

**122.** *Stout v. United States,* 227 F. 799, 802–03 (8th Cir.1915), *cert. denied,* 241 U.S. 664, 36

S.Ct. 549, 60 L.Ed. 1227 (1916); *Keliher v. United States,* 193 F. 8, 15 (1st Cir.1912).

**123.** *Simpson v. United States,* 229 F. 940, 945 (9th Cir.), *cert. denied,* 241 U.S. 668, 36 S.Ct. 552, 60 L.Ed. 1229 (1916).

**124.** *United States v. Morse,* 161 F. 429, 435 (C.C.S.D.N.Y.1908) ("authority" to commit a crime impossible), *aff'd per curiam,* 174 F. 539 (2d Cir.), *cert. denied,* 215 U.S. 605, 30 S.Ct. 406, 54 L.Ed. 346 (1909); *Rieger v. United States,* 107 F. 916, 925 (8th Cir.), *cert. denied,* 181 U.S. 617, 21 S.Ct. 923, 45 L.Ed. 1030 (1901).

the board of directors may have reviewed the loan at some point does not absolve the [defendants] from culpability.[125]

■ Patently an entire bank board, acting unanimously, could not without violating the statute invest bank funds to purchase a boatload of marijuana or make a loan secured only by a chattel mortgage on a kilogram of cocaine. Approval by the bank is a factor, indeed an important one, to be considered in deciding whether the making of the loan itself constituted a misapplication and whether a defendant had the intent to injure or defraud the bank required to sustain a conviction under § 656. But it is not a complete defense.

Cauble next argues that his personal guarantee of the loans charged as misapplications in Counts Five and Eight serves as a complete defense. He contends that, because the purpose of § 656 is to protect national banks, their customers, and the Federal Deposit Insurance Corporation from losses,[126] there can be no violation of the statute when the loan is guaranteed by a solvent party.

■ Conviction under § 656 does not require proof that the bank suffered a loss.[127] But the government must demonstrate more than that the defendant was guilty of maladministration or that funds were irregularly or improperly used.[128] Nonetheless, ultimate restitution is not a defense to the crime of willful misapplication because the crime is complete at the time the misapplication occurs.[129] The gravamen of the offense under § 656 is the defendant's depriving the bank of "its right to have custody of its funds, that is, the right to make its own decisions as to how the funds are used." *United States v. Dreitzler,* 577 F.2d 539, 546 (9th Cir.1978), *cert. denied,* 440 U.S. 921, 99 S.Ct. 1246, 59 L.Ed.2d 473 (1979).[130]

■ Therefore, that the defendant personally guaranteed a misapplied loan does not absolve him absolutely from criminal responsibility. The bank is deprived of custody of and control over its funds when the loan is made and remains so deprived until either the borrower or guarantor repays the money. The existence of a personal guarantee is certainly relevant in determining whether the defendant acted with intent to injure or defraud the bank, but it does not negate such an intent as a matter of law.[131]

---

**125.** 654 F.2d at 328 (quoting *United States v. Beran,* 546 F.2d 1316, 1321 (8th Cir.1976), *cert. denied,* 430 U.S. 916, 97 S.Ct. 1330, 51 L.Ed.2d 595 (1977)). Cauble argues in brief that this exception to the consent defense applies only when the case involves a "fraud" on the bank. This reading is unacceptably narrow, particularly because typically the allegations of the indictment and jury instructions are that in misapplication cases the defendant intended to "injure or defraud" the bank. There is no reason why bank directors should be unable to approve of a "fraud" on themselves but able to approve an "injury."
Furthermore, we stated in *Salinas:* "Review by the board is a particularly dubious basis for exculpating the [defendant] in this case, since the evidence showed that [the defendant] was the moving force behind the board of directors." 654 F.2d at 328 n. 12. Given Cauble's large measure of control over the banks in question, it would ignore reality for us to hold that the board of directors' or loan committee's "approval" of a transaction is a complete defense.

**126.** *See United States v. Barket,* 530 F.2d 181, 186 (8th Cir.1975), *cert. denied,* 429 U.S. 917, 97 S.Ct. 308, 50 L.Ed.2d 282 (1976); *Garrett v.*

*United States,* 396 F.2d 489, 491 (5th Cir.), *cert. denied,* 393 U.S. 952, 89 S.Ct. 374, 21 L.Ed.2d 364 (1968).

**127.** *See, e.g., United States v. Landers,* 576 F.2d 94, 96 (5th Cir.1978).

**128.** *See, e.g., United States v. Christo,* 614 F.2d 486, 490 (5th Cir.1980); *Beran,* 546 F.2d at 1320.

**129.** *See Duncan,* 598 F.2d at 858; *United States v. Southers,* 583 F.2d 1302, 1305–06 (5th Cir. 1978); *Beran,* 546 F.2d at 1322; *United States v. Caldwell,* 544 F.2d 691, 697 (4th Cir.1976).

**130.** *See also Farrell,* 609 F.2d at 819 ("diverting bank funds from their intended purposes"); *Golden v. United States,* 318 F.2d 357, 360–61 (1st Cir.1963).

**131.** Venerable Supreme Court precedent supports this conclusion. In *Agnew v. United States,* 165 U.S. 36, 48, 53–56, 17 S.Ct. 235, 240, 242–43, 41 L.Ed. 624, 625, 626 (1897), the Court held that the defendant was not entitled to a jury charge that if from his guaranty the debt should be paid, the jurors might find that

Intent in a § 656 case is "basically a question for the jury." [132] It exists if the defendant acts knowingly and the natural result of his conduct is or may be to injure the bank; there is no requirement that the accused desire the injury.[133]

Here a reasonable juror might have inferred Cauble's intent to defraud from all of the circumstances. These include Foster's financial incapability [134] and mental instability;[135] the illicit purpose of the loan, which the jury might reasonably have concluded Cauble knew; Cauble's cash-poor situation and the weakness of his guarantee, given his involvement in a major smuggling operation; the diversion of the bank's assets, and Cauble's disregard for the bank's routine procedures.[136] A reasonable jury might have concluded that Cauble's personal guarantee and the directors' or committee's consent was simply insufficient to ne-gate an inference of intent from these facts.[137]

Cauble finally argues that the jury was permitted to convict him of misapplication on a "reckless disregard" standard. In *United States v. Adamson,* 700 F.2d 953 (5th Cir.1983) (en banc), we held that the proper *mens rea* for a § 656 conviction is "knowledge" rather than "reckless disregard." We added, however: "Where sufficiency is at issue, a finding that the accused acted recklessly may be enough to sustain a jury verdict, because a jury may properly *infer* the requisite intent." *Id.* at 962 (emphasis in original).

Although this case was tried before *Adamson* was decided, the jury instruction on intent precisely stated this standard.[138] Cauble nevertheless argues that the instruction on reckless disregard permitted the jury wrongly to convict him solely because

there was no intent to injure and defraud the bank. The Court did not suggest that the guaranty was an absolute defense. *See also Dreitzler,* 577 F.2d at 544, 546; *Fortunato,* 402 F.2d at 80.

**132.** *United States v. Thomas,* 610 F.2d 1166, 1174 (3d Cir.1979) (per curiam); *United States v. Schoenhut,* 576 F.2d 1010, 1024 (3d Cir.), *cert. denied,* 439 U.S. 964, 99 S.Ct. 450, 58 L.Ed.2d 421 (1978).

**133.** *United States v. Farrell,* 609 F.2d 816, 820 (5th Cir.1980); *United States v. Killian,* 541 F.2d 1156, 1159–60 (5th Cir.1976).

**134.** Foster's salary when the loans were made was $250 per week. He apparently had no significant personal assets.

**135.** Foster had been treated for mental illness on a number of occasions. Dr. Donald Whaley, a clinical psychologist who had treated Foster, testified that in April 1978 Foster's mental condition had deteriorated seriously. He stated that he met Cauble in early 1978 and discussed Foster, who was then "in very bad shape."

**136.** For example, Ben Walker, former Executive Vice-President of Western State Bank, testified about the two loans to Foster charged as misapplications. He stated that he received no credit history or financial statement, did not know whether Foster was employed, and had never had any personal dealings with Foster. In response to the question whether it was "routine" to give loans of that size based on so little information, he stated: "Only from [sic] a director asking us to do it." No director except

Cauble had asked the bank to "give loans of that amount to that sort of people." Walker also testified that it was "[n]ot uncommon" for Cauble to ask the bank to make loans.

Peter Brooks, President of the South Main Bank, testified that he knew nothing about Foster and would not have loaned him money but for Cauble's guarantee. Cauble was a director of South Main and owned a large block of bank stock; he eventually acquired 75 percent of the bank's shares. The bank made the loans although Brooks did not know Foster's employment status or salary and had no loan history information.

**137.** We emphasize that, had Cauble's trial attorneys asked for a jury instruction to the effect that the guarantee and the approvals should be considered in determining intent, the district judge should have given such a charge.

**138.** The judge told the jurors:

Intent to injure or defraud the bank, within the meaning of this statute, means to act knowingly, that is with knowledge. A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result. The element of intent to injure or defraud is not fulfilled by a mere showing of indiscretion or neglect on the part of the bank officer. However, intent to injure or defraud may be inferred from acts knowingly done with a reckless disregard for the interests of the bank. Further, it is not necessary that actual injury to the bank be shown.

he authorized loans to Foster, who was emotionally unstable. This claim of error essentially asks us to reinterpret the facts and conclude that Cauble's actions were not, after all, reckless. We decline this invitation. A reasonable jury might have concluded that Cauble acted with intent to injure or defraud the banks. That is the limit of our inquiry.

Cauble had a fair trial. Trial counsel was able and diligent. The trial court's rulings were considered and impartial. After appraising the post-conviction attack on virtually every aspect of the complex proceeding, we are satisfied that the indictment properly charged offenses punishable under the laws of the United States, and that the evidence sufficed to persuade a reasonable jury. Its verdict is, in the ancient words, the verdict of the country. The judgment of conviction and forfeiture entered on that verdict is, accordingly, AFFIRMED.